# UNITED STATES *v.* FALSTAFF BREWING CORP. ET AL.

No. 71–873.  Argued October 17, 1972—Decided February 28, 1973

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, J., joined, and in Part I of which DOUGLAS, J., joined.  DOUGLAS, J., filed an opinion concurring in part, *post,* p. 538.  MARSHALL, J., filed an opinion concurring in the result, *post,* p. 545.  REHNQUIST, J., filed a dissenting opinion, in which STEWART, J., joined, *post,* p. 572.  BRENNAN, J., took no part in the decision of the case.  POWELL, J., took no part in the consideration or decision of the case.

*Assistant Attorney General Kauper* argued the cause for the United States.  With him on the briefs were *Solicitor General Griswold, Acting Assistant Attorney General Comegys, William Bradford Reynolds,* and *Howard E. Shapiro.*

*Matthew W. Goring* argued the cause for appellees.  With him on the brief were *James S. McClellan, Jerome M. McLaughlin,* and *Stephen J. Carlotti.*

Mr. Justice White delivered the opinion of the Court.

Alleging that Falstaff Brewing Corp.'s acquisition of the Narragansett Brewing Co. in 1965 violated § 7 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 18,[1] the United States brought this antitrust suit under the theory that potential competition in the New England beer market may be substantially lessened by the acquisition. The District Court held to the contrary, 332 F. Supp. 970 (1971), and we noted probable jurisdiction[2] to determine whether the trial court applied an erroneous legal standard in so deciding, 405 U. S. 952 (1972). We remand to the District Court for a proper assessment of Falstaff as a potential competitor.

As stipulated by the parties, the relevant product market is the production and sale of beer, and the six New England States[3] compose the geographic market. While beer sales in New England increased approximately 9.5% in the four years preceding the acquisition, the eight largest sellers increased their share of these sales from approximately 74% to 81.2%. In 1960, approximately 50% of the sales were made by the four largest sellers; by 1964, their share of the market was 54%; and

---

[1] Section 7 provides in relevant part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U. S. C. § 18.

For the legislative history of the amendment in 1950 that greatly expanded the section's scope, 64 Stat. 1125, see *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 311–323 (1962).

[2] Jurisdiction lies under § 2 of the Expediting Act, 32 Stat. 823, as amended, 15 U. S. C. § 29.

[3] Maine, New Hampshire, Vermont, Massachusetts, Connecticut, and Rhode Island.

by 1965, the year of acquisition, their share was 61.3%. The number of brewers operating plants in the geographic market decreased from 32 in 1935, to 11 in 1957, to six in 1964.[4]

Of the Nation's 10 largest brewers in 1964, only Falstaff and two others did not sell beer in New England; Falstaff was the largest of the three and had the closest brewery.[5] In relation to the New England market, Falstaff sold its product in western Ohio, to the west and in Washington, D. C., to the south.

The acquired firm, Narragansett, was the largest seller of beer in New England at the time of its acquisition, with approximately 20% of the market; had been the largest seller for the five preceding years; had constantly expanded its brewery capacity between 1960 and 1965; and had acquired either the assets or the trademarks of several smaller brewers in and around the geographic market.

The fourth largest producer of beer in the United States at the time of acquisition, Falstaff was a regional brewer [6] with 5.9% of the Nation's production in 1964, having grown steadily since its beginning as a brewer in 1933 through acquisition and expansion of other breweries. As of January 1965, Falstaff sold beer in 32 States, but did not sell in the Northeast, an area composed of New England and States such as New York and New Jersey; the area being the highest beer consumption region in the

---

[4] Nationally, the number of brewers decreased from 663 in 1935 to 140 in 1965.

[5] Of the three "top ten" brewers that were not selling in New England, Falstaff ranked fourth nationally, the other two ranking eighth and ninth. From Boston, Massachusetts, the distance to Falstaff's closest brewery was 844 miles, while the distance to the eighth and ninth largest sellers' breweries was 1,385 and 2,000 miles respectively.

[6] A "regional," as contrasted with a "national" brewer, is one that is not selling in all the significant national markets.

United States. Between 1955 and 1966, the company's net sales and net income almost doubled, and in 1964 it was planning a 10-year, $35 million program to expand its existing plants.

Falstaff met increasingly strong competition in the 1960's from four brewers who sold in all of the significant markets. National brewers possess competitive advantages since they are able to advertise on a nationwide basis, their beers have greater prestige than regional or local beers, and they are less affected by the weather or labor problems in a particular region. Thus Falstaff concluded that it must convert from "regional" to "national" status, if it was to compete effectively with the national producers.[7] For several years Falstaff publicly expressed its desire for national distribution[8] and after making several efforts in the early 1960's to enter the Northeast by acquisition, agreed to acquire Narragansett in 1965.

Before the acquisition was accomplished, the United States brought suit[9] alleging that the acquisition would violate § 7 because its effect may be to substantially lessen competition in the production and sale of beer in the New England market. This contention was based on two grounds: because Falstaff was a potential entrant

[7] In 1958, Falstaff commissioned a study of actions it should take to maximize profits. The study recommended, *inter alia,* that Falstaff become a national brewer by entering those areas where it was not then marketing its product, especially the Northeast, and that Falstaff should build a brewery on the East Coast rather than buy.

[8] For example, Falstaff in several press releases and in the company publication expressed its desire for national distribution, and at a panel discussion in October 1964 the president of Falstaff, in response to a question as to Falstaff's reaction to industry trends in beer sales, stated: "For long range planning we are aiming for national distribution. Naturally this involves coming East." App. 82.

[9] Suit was filed against both Falstaff and Narragansett, but as to the latter, the complaint was dismissed shortly after it was filed.

and because the acquisition eliminated competition that would have existed had Falstaff entered the market *de novo* or by acquisition and expansion of a smaller firm, a so-called "toe-hold" acquisition.[10] The acquisition was completed after the Government's motions for injunctive relief were denied, and Falstaff agreed to operate Narragansett as a separate subsidiary until otherwise ordered by the court.

After a trial on the merits, the District Court found that the geographic market was highly competitive; that Falstaff was desirous of becoming a national brewer by entering the Northeast; that its management was committed against *de novo* entry; and that competition had not diminished since the acquisition.[11] The District Court then held:

> "The Government's contentions that Falstaff at the time of said acquisition was a potential entrant into said New England market, and that said acquisition deprived the New England market of additional competition are not supported by the evidence. On the contrary, the credible evidence establishes beyond a reasonable doubt that the executive management of Falstaff had consistently decided not to attempt to enter said market unless it could acquire a brewery with a strong and viable distribution system such as that possessed by Narragansett. Said executives had carefully considered such possible alternatives as (1) acquisition of a small brewery on the east coast, (2) the shipping of beer from its

---

[10] Hereinafter, reference to *de novo* entry includes "toe-hold" acquisition as well.

[11] Over the objections of the Government, the District Court allowed post-acquisition evidence and noted in the opinion that the market share of Narragansett dropped from 21.5% in 1964 to 15.5% in 1969, while the shares of the two leading national brewers increased from 16.5% to 35.8%.

existing breweries, the nearest of which was located in Ft. Wayne, Indiana, (3) the building of a new brewery on the east coast and other possible alternatives, but concluded that none of said alternatives would have effected a reasonable probability of a profitable entry for it in said New England market. In my considered opinion the plaintiff has failed to establish by a fair preponderance of the evidence that Falstaff was a potential competitor in said New England market at the time it acquired Narragansett. The credible evidence establishes that it was not a potential entrant into said market by any means or way other than by said acquisition. Consequently it cannot be said that its acquisition of Narragansett eliminated it as a potential competitor therein." 332 F. Supp., at 972.

Also finding that the Government had failed to establish that the acquisition would result in a substantial lessening of competition, the District Court entered judgment for Falstaff and dismissed the complaint.

I

Section 7 of the Clayton Act forbids mergers in any line of commerce where the effect may be substantially to lessen competition or tend to create a monopoly. The section proscribes many mergers between competitors in a market, *United States* v. *Continental Can Co.*, 378 U. S. 441 (1964); *Brown Shoe Co.* v. *United States*, 370 U. S. 294 (1962); it also bars certain acquisitions of a market competitor by a noncompetitor, such as a merger by an entrant who threatens to dominate the market or otherwise upset market conditions to the detriment of competition, *FTC* v. *Procter & Gamble Co.*, 386 U. S. 568, 578–580 (1967). Suspect also is the acquisition by a company not competing in the market but so situated

as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because the entry eliminates a potential competitor exercising present influence on the market. *Id.*, at 580–581; *United States* v. *Penn-Olin Chemical Co.*, 378 U. S. 158, 173–174 (1964). As the Court stated in *United States* v. *Penn-Olin Chemical Co., supra,* at 174, "The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated."

In the case before us, Falstaff was not a competitor in the New England market, nor is it contended that its merger with Narragansett represented an entry by a dominant market force. It was urged, however, that Falstaff was a potential competitor so situated that its entry by merger rather than *de novo* violated § 7. The District Court, however, relying heavily on testimony of Falstaff officers, concluded that the company had no intent to enter the New England market except through acquisition and that it therefore could not be considered a potential competitor in that market. Having put aside Falstaff as a potential *de novo* competitor, it followed for the District Court that entry by a merger would not adversely affect competition in New England.

The District Court erred as a matter of law. The error lay in the assumption that because Falstaff, as a matter of fact, would never have entered the market *de novo,* it could in no sense be considered a potential competitor. More specifically, the District Court failed to give separate consideration to whether Falstaff was a potential competitor in the sense that it was so posi-

tioned on the edge of the market that it exerted beneficial influence on competitive conditions in that market.

A similar error was committed by the Court of Appeals in *FTC* v. *Procter & Gamble Co., supra,* where one of the reasons for the Commission's finding the acquisition in violation of § 7 was that the merger eliminated Procter as a potential entrant, not because Procter would have entered independently, but because the acquisition eliminated the procompetitive effect Procter exerted from the fringe of the market. *Id.,* at 575. The Court of Appeals struck down this finding because there was no evidence that Procter ever intended *de novo* entry, but we held the Commission's finding was "amply supported by the evidence," *id.,* at 581, because the evidence "clearly show[ed] that Procter was the most likely entrant," *id.,* at 580, and it was "clear that the existence of Procter at the edge of the industry exerted considerable influence on the market," *id.,* at 581. Thus, the fact that Falstaff and its management had no intent to enter *de novo,* and would not have done so, does not *ipso facto* dispose of the potential-competition issue.

The specific question with respect to this phase of the case is not what Falstaff's internal company decisions were but whether, given its financial capabilities and conditions in the New England market, it would be reasonable to consider it a potential entrant into that market. Surely, it could not be said on this record that Falstaff's general interest in the New England market was unknown; [12] and if it would appear to rational beer merchants in New England that Falstaff might well build a new brewery to supply the northeastern market then its entry by merger becomes suspect under § 7. The District Court should therefore have appraised the economic facts about Falstaff and the New England market

---

[12] See n. 8, *supra,* and accompanying text.

in order to determine whether in any realistic sense Falstaff could be said to be a potential competitor on the fringe of the market with likely influence on existing competition.[13]  This does not mean that the testimony

[13] In *FTC* v. *Procter & Gamble Co.*, 386 U. S. 568, 581 (1967), we found the acquiring company at the edge of the market exerted "considerable influence" on the market because "market behavior . . . was influenced by each firm's predictions of the market behavior of its competitors, actual and potential"; because "barriers to entry . . . were not significant" as to the acquiring company; because "the number of potential entrants was not so large that the elimination of one would be insignificant"; and because the acquiring firm was the most likely entrant.

It is suggested that the District Court failed to consider whether Falstaff was an on-the-fringe potential competitor with influence on existing competition because the Government never alleged in its complaint that Falstaff was exerting a present procompetitive influence, never proceeded under this theory, and further failed to introduce any evidence to support this view.  But this position merely ascribes an arbitrary meaning to the language of the complaint.  The Government in its complaint alleged that the acquisition violated § 7 because it eliminated potential competition; since potential competition may stimulate a present procompetitive influence, the allegation certainly encompassed the "on-the-fringe influence" that the District Court failed to consider, and the Government was not required to be more specific in its allegation.

The Government did not produce direct evidence of how members of the New England market reacted to potential competition from Falstaff, but circumstantial evidence is the lifeblood of antitrust law, see *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U. S. 100 (1969); *Interstate Circuit, Inc.* v. *United States*, 306 U. S. 208, 221 (1939); *Frey & Son, Inc.* v. *Cudahy Packing Co.*, 256 U. S. 208, 210 (1921), especially for § 7 which is concerned "with probabilities, not certainties," *Brown Shoe Co.* v. *United States*, 370 U. S., at 323.  As was stated in *United States* v. *Penn-Olin Chemical Co.*, 378 U. S. 158, 174 (1964), "[p]otential competition cannot be put to a subjective test.  It is not 'susceptible of a ready and precise answer.' "

Nor was there any lack of circumstantial evidence of Falstaff's on-the-fringe competitive impact.  As the record shows, Falstaff was in the relevant line of commerce, was admittedly interested in

of company officials about actual intentions of the company is irrelevant or is to be looked upon with suspicion; but it does mean that theirs is not necessarily the last

---

entering the Northeast, and had, among other ways, see n. 8, *supra*, made its interest known by prior-acquisition discussions. Moreover, there were, as my Brother MARSHALL would put it, objective economic facts as to Falstaff's capability to enter the New England market; and the same facts which he would have the District Court look to in determining whether the particular theory of potential competition we do not reach has been violated, would be probative of violation of § 7 through loss of a procompetitive on-the-fringe influence. See *FTC* v. *Procter & Gamble Co., supra,* at 580–581; *United States* v. *Penn-Olin Chemical Co., supra,* at 173–177; *United States* v. *El Paso Natural Gas Co.,* 376 U. S. 651, 660 (1964).

And as for the contention that the Government did not proceed under this on-the-fringe influence view, the record is to the contrary. At one point in the trial, the Government informed the trial judge that a deposition was being introduced into evidence "to establish that Falstaff was a company that was on the wings or at the edge of the New England market. . . . What I mean by that is that Falstaff was capable and interested in entering the New England market and would be waiting for the opportunity to develop, but that Falstaff, over the long term, would eventually or could eventually or was a likely entrant into the New England market, to use the terminology in *FTC* v. *Procter & Gamble Company.*" App. 124. Further into its presentation of proof, the Government was introducing evidence of the trend toward concentration in the market, and stated: "It is this concentration, your Honor, which, as we attempted to point out in our pretrial brief, makes potential competition. . . . The concentration of sales within a small number of firms in New England. This is what makes the potential competition . . . so very, very important to this market. . . . In such a situation the potential entry of a fresh competitive factor is of extreme importance." App. 170.

That the on-the-fringe influence theory was one of the theories the Government was proceeding under was apparent to Falstaff. In its opening statement, Falstaff stated:

"Now, the Government has a theory which is, so far as the judicial determinations on the point are concerned, comparatively new. You were handed the other day a portion of the record in FTC against Bendix-Fram Corporation, and you were handed at the

word in arriving at a conclusion about how Falstaff should be considered in terms of its status as a potential entrant into the market in issue.

same time a typed or otherwise reproduced copy of the opinion of Commissioner Elman of the FTC in that case.

"That opinion is not yet officially reported. The case is on its way to an appeal . . . . The Commissioner announced a theory upon which the Government relies and which they say lies within the ambit of this vague, undefined creature, potential competition. What that decision, on appeal as I say, what that decision announces is the doctrine which is called the toe-hold doctrine, and it goes like this:

"If a producer of Product A is standing in the wings, as the Commissioner says, outside the market, merely standing there, but in a position to move into the market if he chooses. He must remain there in the wings and forbear acquiring the producer of a like product within the market area.

"The Commissioner fancies that the mere presence of such a manufacturer or seller close to the market area had some effect which could fall within his ill-defined concept of potential competition. And he found in Bendix-Fram that Bendix was in such a position. He found that Bendix could have acquired a small company rather than Fram, a relatively larger one, beefed it up by expenditures of money which Bendix could afford, and develop it into a full-blown competitor within the market area. I do not know whether that notion will gain substantial acceptance in the theory of antitrust law. I do not know that it will have the approval of the Supreme Court if and when it ever reaches it. I do know, however, that that is an entirely different situation [than] we have here.

"*If there is any sense to this total theory at all it must be that the acquiring company was in fact so closely located to the market served by the acquired company that its entrance into the market unilaterally, under its own steam, without motivation was a distinct threat to those who were competing in the market.*" App. 182–183. (Emphasis added.)

Falstaff then proceeded to state why it felt that the on-the-fringe influence theory did not apply in this case.

During its proof, Falstaff had both its expert witness on economics, App. 257, and an officer of Narragansett, App. 376, testify as to whether Falstaff's presence had a procompetitive effect, both stating that it did not.

Since it appears that the District Court entertained too narrow a view of Falstaff as a potential competitor and since it appears that the District Court's conclusion that the merger posed no probable threat to competition followed automatically from the finding that Falstaff had no intent to enter *de novo,* we remand this case for the District Court to make the proper assessment of Falstaff as a potential competitor.

## II

Because we remand for proper assessment of Falstaff as an on-the-fringe potential competitor, it is not necessary to reach the question of whether § 7 bars a market-extension merger by a company whose entry into the market would have no influence whatsoever on the present state of competition in the market—that is, the entrant will not be a dominant force in the market and has no current influence in the marketplace. We leave for another day the question of the applicability of § 7 to a merger that will leave competition in the marketplace exactly as it was, neither hurt nor helped, and that is challengeable under § 7 only on grounds that the company could, but did not, enter *de novo* or through "toe-hold" acquisition and that there is less competition than there would have been had entry been in such a manner. There are traces of this view in our cases, see *Ford Motor Co.* v. *United States,* 405 U. S. 562, 567 (1972); *id.,* at 587 (BURGER, C. J., concurring in part and dissenting in part); *FTC* v. *Procter & Gamble Co.,* 386 U. S., at 580; *id.,* at 586 (Harlan, J., concurring); *United States* v. *Penn-Olin Chemical Co.,* 378 U. S., at 173, but the Court has not squarely faced the question,[14] if for no other reason than because there has

---

[14] It is suggested that certain language in the Court's opinion in *United States* v. *Continental Can Co.,* 378 U. S. 441, 464 (1964), is to the contrary. But there the merger was held proved prima facie

been no necessity to consider it. See *Ford Motor Co.* v. *United States, supra; FTC* v. *Procter & Gamble Co., supra; United States* v. *Penn-Olin Chemical Co., supra; United States* v. *El Paso Natural Gas Co.,* 376 U. S. 651 (1964).

The judgment of the District Court dismissing the complaint against Falstaff is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE BRENNAN took no part in the decision of this case. MR. JUSTICE POWELL took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, concurring in part.

Although I join Part I of the Court's opinion and its judgment remanding the case to the District Court for further proceedings consistent with the opinion, I offer the following observations with respect to the question which the Court does not reach.

There can be no question that it would be sufficient for the Government to prove its case to show that Falstaff would have made a *de novo* entry but for the acquisition of Narragansett or that Falstaff was a potential competitor exercising present influence on the market. See *Ford Motor Co.* v. *United States,* 405 U. S. 562; *FTC* v. *Procter & Gamble Co.,* 386 U. S. 568; *United States* v. *Penn-Olin Chemical Co.,* 378 U. S. 158; *United States* v. *El Paso Natural Gas Co.,* 376 U. S. 651. But, I do not believe that it was a prerequisite to the Gov-

anticompetitive because the acquiring and acquired companies were engaged in the same overall line of commerce in the same geographic market. This notwithstanding, it is again only arbitrary to assume that the quoted language was not referring to the acquired company's on-the-fringe influence as a potential competitor for certain end uses for containers.

ernment's case to prove that the acquisition had marked immediate, *i. e.*, present, anticompetitive effects.

Section 7 evidences a definite concern for protecting competitive markets. It does not require "merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future . . . ." *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 362. In *United States* v. *Penn-Olin Chemical Co., supra,* at 170–171, the Court said:

> "The grand design of the original § 7, as to stock acquisitions, as well as the Celler-Kefauver Amendment, as to the acquisition of assets, was to arrest incipient threats to competition which the Sherman Act did not ordinarily reach. It follows that actual restraints need not be proved. The requirements of the amendment are satisfied when a 'tendency' toward monopoly or the 'reasonable likelihood' of a substantial lessening of competition in the relevant market is shown."

Moreover, we are concerned with probabilities, not certainties. See *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 323.

Falstaff acquired Narragansett in 1965. Prior to that time, Falstaff was the largest brewer in the country that did not sell in the New England market. It had stated publicly that it wanted to become a national brewer to allow it to compete more effectively with the existing national brewers. Falstaff has conceded in its brief that "given an acceptable level of profit it had the financial capability and the interest to enter the New England beer market."

During the four years preceding 1965, beer sales in New England had increased approximately 9.5%. Nevertheless, the market had become more concentrated. In 1960, the eight largest sellers accounted for approximately

74% of the beer sales; by 1964, they accounted for 81.2%. From 1957 to 1964, the number of breweries decreased from 11 to 6. In addition, there is evidence that two of the remaining breweries were interested in being acquired. And, by Falstaff's own admission, "[a]t the time of the acquisition, the substantial growth in the market shares of the national brewers was just beginning to occur."

One of the principal purposes of § 7 was to stem the "'rising tide' of concentration in American business." *United States* v. *Pabst Brewing Co.*, 384 U. S. 546, 552. When an industry or a market evidences signs of decreasing competition, we cannot allow an acquisition which may "tend to accelerate concentration." *Ibid.;* *Brown Shoe Co.* v. *United States, supra,* at 346.

The implications of the Clayton Act, as amended by the Celler-Kefauver Act, 15 U. S. C. § 18, are much, much broader than the customary restraints of competition and the power of monopoly. Louis D. Brandeis testified in favor of the bill that became the Clayton Act in 1914. "You cannot have true American citizenship, you cannot preserve political liberty, you cannot secure American standards of living unless some degree of industrial liberty accompanies it."[1] He went on to say[2] in answer to George W. Perkins, who testified against the bill:

> "Mr. Perkins' argument in favor of the efficiency of monopoly proceeds upon the assumption, in the first place, and mainly upon the assumption, that with increase of size comes increase of efficiency. If any general proposition could be laid down on that subject, it would, in my opinion, be the opposite. It is, of course, true that a business unit may be too small to be efficient, but it is equally

[1] Hearings on S. Res. 98 before the Senate Committee on Interstate Commerce, 62d Cong., Vol. 1, p. 1155.

[2] *Id.,* at 1147.

true that a unit may be too large to be efficient. And the circumstances attending business to-day are such that the temptation is toward the creation of too large units of efficiency rather than too small. The tendency to create large units is great, not because larger units tend to greater efficiency, but because the owner of a business may make a great deal more money if he increases the volume of his business ten-fold, even if the unit profit is in the process reduced one-half. It may, therefore, be for the interest of an owner of a business who has capital, or who can obtain capital at a reasonable cost, to forfeit efficiency to a certain degree, because the result to him, in profits, may be greater by reason of the volume of the business. Now, not only may that be so, but in very many cases it is so.

"And the reason why . . . increasing the size of a business may tend to inefficiency is perfectly obvious when one stops to consider. Anyone who critically analyzes a business learns this: That success or failure of an enterprise depends usually upon one man; upon the quality of one man's judgment, and, above all things, his capacity to see what is needed and his capacity to direct others."

That is why the Celler Committee reporting in 1971 on conglomerates and other types of mergers [3] said that "Preservation of a competitive system was seen as essential to avoid the concentration of economic power that was thought to be a threat to the Nation's political and social system." [4] Control of American business is being transferred from local communities to distant cities

---

[3] Investigation of Conglomerate Corporations, Report by the Staff of Antitrust Subcommittee of the House Committee on the Judiciary on H. Res. 161, 92d Cong., 1st Sess. (Comm. Print).

[4] *Id.*, at 18.

542

where men on the 54th floor with only balance sheets and profit and loss statements before them decide the fate of communities with which they have little or no relationship. As a result of mergers and other acquisitions, some States are losing major corporate headquarters and their local communities are becoming satellites of a distant corporate control.[5] The antitrust laws favored a wide diffusion of corporate control; and that aim has been largely defeated with serious consequences. Thus, a recent Wisconsin study shows that "[t]he growth of aggregate Wisconsin employment of companies acquired by out-of-state corporations declined substantially more than that of those acquired by in-state corporations." [6] In this connection, the Celler Report states: [7]

"The Wisconsin study found, also, that 53 percent of acquired companies after the merger had a slower rate of payroll growth. Payroll growth, notably in large firms acquired by out-of-State corporations, was depressed by mergers. Inflation in recent years has markedly raised wages and salaries. It would be reasonable to expect that payrolls in acquired companies, because of the inflation, would have advanced more than employment. In this connection, the report states: 'The fact that this frequently did not happen in companies acquired by out-of-state firms would lead one to believe that their acquirers have transferred a portion of the higher salaried employees to a location outside Wisconsin. Such transfers mean a loss of talent, retail expenditures, and personal income taxes in the economies of Wisconsin's communities and the state.'"

[5] *Id.*, at 52–53.
[6] *Id.*, at 53.
[7] *Id.*, at 54.

The adverse influence on local affairs of out-of-state acquisitions has not gone unnoticed in our opinions. Thus "the desirability of retaining 'local control' over industry and the protection of small businesses" was our comment in *Brown Shoe Co.* v. *United States,* 370 U. S., at 315–316, on one of the purposes of strengthening § 7 of the Clayton Act through passage of the Celler-Kefauver Act.

By reason of the antitrust laws, efficiency in terms of the accounting of dollar costs and profits is not the measure of the public interest nor is growth in size where no substantial competition is curtailed. The antitrust laws look with suspicion on the acquisition of local business units by out-of-state companies. For then local employment is apt to suffer, local payrolls are likely to drop off, and responsible entrepreneurs in counties and States are replaced by clerks.

A case in point is Goldendale in my State of Washington. It was a thriving community—an ideal place to raise a family—until the company that owned the sawmill was bought by an out-of-state giant. In a year or so, auditors in faraway New York City, who never knew the glories of Goldendale, decided to close the local mill and truck all the logs to Yakima. Goldendale became greatly crippled. It is Exhibit A to the Brandeis concern, which became part of the Clayton Act concern, with the effects that the impact of monopoly often has on a community, as contrasted with the beneficent effect of competition.

A nation of clerks is anathema to the American antitrust dream. So is the spawning of federal regulatory agencies to police the mounting economic power. For the path of those who want the concentration of power to develop unhindered leads predictably to socialism that is antagonistic to our system. See Blake & Jones, The Goals of Antitrust: A Dialogue on Policy—In Defense of Antitrust, 65 Col. L. Rev. 377 (1965).

It is against this background that we must assess the acquisition by Falstaff, the largest producer of beer in the United States that did not sell in the New England market, of the leading seller in that market.

In *United States* v. *El Paso Natural Gas Co.,* 376 U. S., at 660, we indicated that "[t]he effect on competition in a particular market through acquisition of another company is determined by the nature or extent of that market and by the nearness of the absorbed company to it, that company's eagerness to enter that market, its resourcefulness, and so on." Falstaff's president testified below that Falstaff for some time had wanted to enter the New England market as part of its interest in becoming a national brewer. And Falstaff has conceded in its brief before this Court that "given an acceptable level of profit it had the financial capability and the interest to enter the New England beer market." With both the interest and the capability to enter the market, Falstaff was "the most likely entrant." *FTC* v. *Procter & Gamble Co.,* 386 U. S., at 581. Thus, although Falstaff might not have made a *de novo* entry if it had not been allowed to acquire Narragansett,[8] we cannot say that it would be unwilling to make such an entry *in the future* when the New England market might be ripe for an infusion of new competition. At this point in time, it is the most likely new competitor. Moreover, there can be no question that replacing the leading seller in the market, a regional brewer, with a seller

---

[8] Falstaff contended below that a *de novo* entry would not be profitable. Management stated that an established distribution system was a prerequisite to entry. The District Judge concluded that "[t]he credible evidence establishes that [Falstaff] was not a potential entrant into said market by any means or way other than by said acquisition." 332 F. Supp. 970, 972.

with national capabilities increased the trend toward concentration.

I conclude that there is "reasonable likelihood" that the acquisition in question "may be substantially to lessen competition." Accordingly, I would be inclined to reverse and direct the District Judge to enter judgment for the Government and afford appropriate relief. Nevertheless, since the Court will not reach this question and I agree with the legal principles set forth in Part I of its opinion, I join the judgment remanding the case for further proceedings.

MR. JUSTICE MARSHALL, concurring in the result.

I share the majority's view that the District Judge erred as a matter of law and that the case must be remanded for further proceedings. I cannot agree, however, with the theory upon which the majority bases the remand.

The majority accuses the District Judge of neglecting to assess the present procompetitive effect which Falstaff exerted by remaining on the fringe of the market. The explanation for this failing is rather simple. The Government never alleged in its complaint that Falstaff was exerting a present procompetitive influence,[1] it introduced not a scrap of evidence to support this view,[2] and

---

[1] The Government's complaint alleged that the merger violated § 7 because "[p]*otential* ccmpetition in the production and sale of beer between Falstaff and Narragansett will be eliminated." (Emphasis added.) While it is true, as the majority asserts, that "potential competition may stimulate a present procompetitive influence," see *ante,* at 534 n. 13, the complaint nowhere alleges that such a procompetitive influence occurred in this case.

[2] Significantly, the majority cites no evidence at all from the record indicating that firms within the New England market were deterred from anticompetitive practices by Falstaff's presence at the market fringe. Indeed, my Brethren concede that "[t]he Govern-

even at this stage of the proceedings, it seemingly disclaims reliance on this theory.[3]

Thus, our remand leaves the hapless District Judge with the unenviable task of reassessing nonexistent evidence under a theory advanced by neither of the parties. I submit that civil antitrust litigation is complicated enough when the trial judge confines his attention to the legal arguments and evidence offered by the parties and avoids investigation of hypothetical lawsuits which might have been brought.

---

ment did not produce direct evidence of how members of the New England market reacted to potential competition from Falstaff," *ibid.* While the majority contends that there was "circumstantial evidence" relevant to determining whether there was a loss of procompetitive influence, the evidence it points to suggests only that Falstaff might have been perceived as a potential entrant—not that this perception produced a present procompetitive effect. In fact, the little evidence on the question which does appear in the record strongly suggests that Falstaff was exerting no procompetitive influence. Thus, an economist testifying for the defense stated that, in his expert judgment, Falstaff's presence on the fringe of the market "had no effect" on the practices of firms within the market (App. 257). Similarly, the director of marketing for Narragansett testified that those within the market did not view Falstaff as a threat and that it never occurred to them that Falstaff would attempt a *de novo* entry (App. 376).

To be sure, this testimony may well have been biased and might properly have been discounted by the trier of fact. But it is harder to dismiss the documentary evidence showing continued vigorous competition after Falstaff's entry by acquisition. If Falstaff was exerting a substantial procompetitive influence by threatening entry, it would seem to follow that anticompetitive practices should have emerged when this threat was removed. The majority nowhere accounts for the continuing absence of such practices.

[3] In its brief before this Court, the Government characterizes its cause of action as follows:

"The theory of the suit was that *potential competition* in the New England beer market may be substantially lessened by the acquisition." Brief for United States 2–3.

The majority's departure from this self-evident proposition is all the more startling when one realizes that the Court eschews reliance on a well-established, plainly applicable body of law in order to reach questions not properly before it. As MR. JUSTICE DOUGLAS ably demonstrates, see *ante,* at 539–540, many decisions by this Court hold that § 7 is violated when a merger is reasonably likely to eliminate future or potential competition. See also *infra,* at 560–562. I know of no case suggesting that this principle is only applicable when the plaintiff can show that the merger will have present anticompetitive consequences, and the majority cites no authority for this proposition.

In the course of a nine-day trial, the Government introduced voluminous evidence to support its potential competition theory. But at the conclusion of the trial, the District Judge dismissed the Government's action in an opinion covering a scant two and one-half pages in the Federal Supplement [4] and without making any findings of fact or conclusions of law.[5] See *United States* v. *Falstaff Brewing Corp.,* 332 F. Supp. 970 (RI 1971).

The court held that Falstaff "was not a potential entrant into said market by any means or way other than by said acquisition. Consequently, it cannot be

---

[4] Cf. *United States* v. *El Paso Natural Gas Co.,* 376 U. S. 651, 663 (1964) (opinion of Harlan, J.) :

"Both as a practitioner and as a judge I have more than once felt that a closely contested government antitrust case, decided below in favor of the defendant, has foundered in this Court for lack of an illuminating opinion by the District Court. District Courts should not forget that such cases, the trials of which usually result in long and complex factual records, come here without the benefit of any sifting by the Courts of Appeals. The absence of an opinion by the District Court has been a handicap in this instance."

[5] See Fed. Rule Civ. Proc. 52 (a). Cf. *United States* v. *El Paso Natural Gas Co., supra,* at 656–657.

said that its acquisition of Narragansett eliminated it as a potential competitor therein." *Id.,* at 972. The District Judge based this conclusion on testimony by Falstaff executive personnel that "Falstaff had consistently decided not to attempt to enter said market unless it could acquire a brewery with a strong and viable distribution system such as that possessed by Narragansett." *Ibid.*

Inasmuch as the District Court grounded its dismissal on these conclusions, I think we have a responsibility to assess the validity of the legal standard from which they are derived. I would hold that where, as here, strong objective evidence indicates that a firm is a potential entrant into a market, it is error for the trial judge to rely solely on the firm's subjective prediction of its own future conduct. While such subjective evidence is probative on the issue of potential entry, it is inherently unreliable and must be used with great care. Ordinarily, the district court should presume that objectively measurable market forces will govern a firm's future conduct. Only when there is a compelling demonstration that a firm will not follow its economic self-interest may the district court consider subjective evidence in predicting that conduct. Even then, subjective evidence should be preferred only when the objective evidence is weak or contradictory. Because the District Court failed to apply these standards, I would remand the case for further consideration.

I

Although this case ultimately turns on a point of law, it cannot be satisfactorily understood without some appreciation of the factual context in which it arises. A somewhat more detailed description of the relevant line of commerce, the relevant geographic market, and the market structure than that provided by the majority is therefore in order.

## A. The Product Market

The relevant product market is the production and sale of beer. The firms competing for this market can be divided into three categories: national, regional, and local. The national firms, Anheuser-Busch, Schlitz, Pabst, and Miller, sell their product throughout the country and advertise on a national basis. In contrast, the regional firms, the largest of which are Hamm's, Carling, Coors, Falstaff, and National Bohemian, market their beer in narrower geographical areas of varying size. Local brewers sell their product in a small area, sometimes no larger than a single State.

Originally, most of the market was held by a large number of small local and regional brewers. The high cost of transporting beer favored the local distributor in early years. But more recently, the national brewers have been able to overcome this difficulty to some extent by decentralizing their production facilities. Moreover, any remaining extra transportation costs associated with national distribution are now outweighed by the advantages of centralized management and, especially, national advertising. Thus, in recent years, while the beer market as a whole has expanded, the number of breweries has declined dramatically. See *United States* v. *Pabst Brewing Co.*, 384 U. S. 546, 550 (1966). Whereas in 1935 there were 684 brewing plants operating in the United States, by 1965 the number had been reduced to 178. Economies of scale, a relatively low profit margin, and significant barriers to market entry have all led to a concentration of beer production among the few national and large regional brewers.

## B. The Geographic Market

These national trends are reflected in the six New England States, which constitute the relevant geographic market. In the four years preceding Falstaff's acquisi-

tion of Narragansett, New England beer sales increased 9.5%—a substantial gain, although somewhat below the increase in national sales for the same period. At the same time, however, the number of brewers operating plants in the region declined precipitately. Thus, in 1957, there were 11 breweries in the New England States, but by 1964 the number had declined to six, and of those six, two of the three smallest had publicly expressed an interest in merging with a larger competitor.

Not surprisingly, this decline in the number of breweries in New England was accompanied by an increase in the market shares of those selling in the region. In 1960, the eight largest participants in the New England market claimed 74% of all beer sales, and by 1964 this figure had risen to 81.2%. Examination of the four largest brewers shows that their share of the market rose from about 50% in 1960 to 54% in 1964, to 61.3% in 1965. In large part, these figures are probably explicable in terms of the nationwide trend in favor of the large national and regional brewers. Seven of the Nation's 10 largest breweries, including, of course, all the national breweries, sell beer in New England, and their share of the market has increased as the small, local brewers disappeared.

At the same time, however, the concentration of the market does not yet seem to have produced blatantly anticompetitive effects. In recent years, prices have remained fairly stable despite rising costs, and competition seems relatively intense among the few large firms which dominate the market. Still, there is no doubt that the seeds of anticompetitive conduct are present, since "[a]s [an oligopolistic] condition develops, the greater is the likelihood that parallel policies of mutual advantage, not competition, will emerge." *United States* v. *Aluminum Co. of America,* 377 U. S. 271, 280 (1964). One commentator's description of the national beer market aptly characterizes the situation in New England: "The

increasing concentration . . . and the unlikely entrance of new rivals poses a threat to the future level of competition in this industry. Thus far, there is no evidence of collusion in the beer industry. But as the industry becomes populated by fewer and fewer companies, the possibility and likelihood will be enhanced of their engaging in tacit or direct collusion—given the inelastic nature of demand—to establish a joint profit maximizing price and output. Similarly, the chances will become slimmer that individual firms in the industry will follow a truly independent price and production strategy, vigorously striving to take sales away from rival brewers. With only a few sellers will come the increasing awareness that parallel business behavior might be feasible." Elzinga, The Beer Industry, in W. Adams, The Structure of American Industry 189, 213 (4th ed. 1971).

## C. Narragansett—The Acquired Firm

Narragansett is a regional brewery with only minuscule sales outside of New England. Within the New England market, however, the firm has been highly successful. Although only twenty-first in national sales and accounting for only 1.4% of the beer sales in the United States, Narragansett was the largest seller of beer in New England for the five years preceding its acquisition. In recent years, the firm has expanded steadily until, in 1964, the year before acquisition, it sold 1.275 million barrels, which was about 20% of the New England market. Net profits had increased from $417,284 in 1960 to a record level of $713,083 in 1964.

Notwithstanding this growth, Narragansett felt itself under some pressure from the national brewers.[6] The

---

[6] This pressure continued during the post-acquisition period. From 1964 to 1969, Narragansett's share of the market slipped from 21.5% to 15.5%, while Anheuser-Busch and Schlitz, two large national firms, increased their combined share from 16.5% to 35.8%.

corporation was closely held by the Haffenreffer family, and the stockholders apparently concluded that it was in their interest to diversify their personal holdings by selling Narragansett.

## D. *Falstaff—The Acquiring Firm*

Like Narragansett, Falstaff has been highly successful in recent years. Beginning with a 100,000-barrel plant in St. Louis shortly after the repeal of Prohibition, the firm has steadily grown. By 1964, it was the Nation's fourth largest producer, marketing 5.8 million barrels, or 5.9% of the total national production.

Throughout its history, Falstaff has followed a pattern of acquiring weak breweries and expanding them so as to extend its influence to new markets. Although still a regional brewer, by 1965 the company had expanded its network of plants and distributorships over an area far larger than that in which Narragansett competed. In that year, Falstaff operated eight plants and sold its product in 32 States in the West, Midwest, and South. Sixteen of these States were added in the period after 1950. However, as of 1965, Falstaff sold virtually no beer in any of the Northeastern States, including the six composing the New England area. Falstaff marketed its product both through company-owned branches and through some 600 independent distributorships.[7]

---

[7] At trial, Falstaff argued that it was unlikely to make a *de novo* entry into the New England market since it had learned through experience that a strong, pre-existing organization of distributors was essential to success. It is true that Falstaff sold most of its beer through independent distributors. However, it should be noted that between 20% and 25% of its sales were made through company branches which Falstaff had established itself. As might be expected, Falstaff's profit margin was significantly higher in areas where it used its own distribution facilities. Moreover, Falstaff's assertion is belied by its own prior history. As noted above, for years Falstaff had successfully expanded by purchasing failing

In the years immediately prior to its acquisition of Narragansett, Falstaff's steady pattern of growth had continued. Between 1955 and 1964, its sales increased from $77 million to $139.5 million and its net profits grew from $4.3 million to $7 million. In the year before acquisition, the company announced a 10-year expansion program in which it was prepared to invest $35 million.

Yet, despite this encouraging trend, Falstaff, like Narragansett, was to some extent handicapped by the competitive advantages—in particular, national advertising—enjoyed by national distributors. For years, the company had publicly expressed the desire to become a national brewer, and the logical region for market extension was the Northeast. New England seemed a particularly appropriate area to initiate expansion. As indicated above, seven of the 10 largest manufacturers already sold beer in New England, and Falstaff was the largest of the three remaining outside the market. The New England market was expanding at a healthy rate, and it appeared to be a fertile area for growth.

In 1958, Falstaff commissioned a study from Arthur D. Little, Inc., to determine the feasibility of future expansion. The Little Report, two years in the making, concluded that Falstaff should enter the northeastern market sometime within the next five years. But although it was clear that Falstaff should move into the northeast market, the method of entry was less obvious. After a careful review of cost estimates and the ratio of earnings to net worth, the Little Report recommended *de novo* entry through the construction of a new plant to serve the Northeast. The report concluded that "[t]here appears to be ample reason . . . for building rather than buying . . . [and] that major new market entrances need

---

breweries with weak distribution facilities and turning them into effective competitors.

not be predicated on the availability of a brewery Falstaff could purchase."

Despite this analysis, Falstaff's own management personnel apparently concluded that the profit return on a *de novo* entry would be inordinately low.[8] Falstaff argued at trial that it needed a strong, pre-existing distribution system to make a profitable entry. But cf. n. 7, *supra.* An independent economist, Dr. Ira Horowitz, testified on behalf of Falstaff that *de novo* entry would result in a 6.7% return which he characterized as "a very, very poor investment indeed." However, it should be noted that the 6.7% figure failed to account for the increment in Falstaff's profit margin which would result from its newly gained status as a national brewer with modern plants to serve the eastern part of the Nation—the very increment which provided the primary motivation for expansion in the first place. While Dr. Horowitz apparently recognized that such an increment might materialize, he stated that he was unable to estimate its size.[9] Moreover, even the 6.7% return rate compares favorably with Falstaff's actual rate of return on its Narragansett purchase, which was a mere 3.7%.

In any event, whatever the abstract merits of this dispute, it is clear that Falstaff's management personnel determined that entry by acquisition offered the preferable avenue for expansion. Beginning in 1962, the company held discussions with Liebmann, P. Ballantine

---

[8] At trial, Falstaff also argued that the other Little recommendations which Falstaff did follow led to disastrous consequences, that Little's estimate of construction costs were unrealistic, and that the Little Report was premised on Falstaff's penetration of the mid-Atlantic as well as the New England market.

[9] Dr. Horowitz' estimates were based on the assumption that Falstaff's profit margin would be $1.16 per barrel, which was the margin currently enjoyed by the company. However, Anheuser-Busch and Pabst, two of the larger national breweries, both earned more than $2.50 per barrel in their modern plants.

& Sons,[10] Piel Brothers, and Dawsons, all of which did a significant percentage of their business in the New England market. All of these possibilities were eventually rejected, and in 1965, Falstaff finally settled on Narragansett as the most promising available brewery.

## II

With this factual background, it becomes possible to articulate the legal standards which should govern the resolution of this case.

### A. The Purposes of § 7

As is clear from its face, § 7 was designed to deal with the anticompetitive effects of excessive industrial concentration caused by the corporate marriage of two competitors. "It is the basic premise of [§ 7] that competition will be most vital 'when there are many sellers, none of which has any significant market share.' " *United States* v. *Aluminum Co. of America*, 377 U. S., at 280.

But § 7 does more than prohibit mergers with immediate anticompetitive effects. The Act by its terms prohibits acquisitions which "may . . . substantially . . . lessen competition, or . . . tend to create a monopoly." The use of the subjunctive indicates that Congress was concerned with the *potential* effects of mergers even though, at the time they occur, they may cause no present anticompetitive consequences. See, *e. g., FTC* v. *Procter & Gamble Co.*, 386 U. S. 568, 577 (1967). To be sure, remote possibilities are not sufficient to satisfy the test set forth in § 7. Despite substantial concern with halting a trend toward concentration in its incipiency, Congress did not intend to prohibit all expansion and growth through acquisition

---

[10] Ultimately, on March 6, 1972, Falstaff announced plans to acquire Ballantine's trademarks and tradename.

and merger. The predictive judgment often required under § 7 involves a decision based upon a careful scrutiny and a reasonable assessment of the future consequences of a merger without unjustifiable, speculative interference with traditional market freedoms. As we stated in *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 323 (1962): "Congress used the words *'may be* substantially to lessen competition' (emphasis supplied), to indicate that its concern was with probabilities, not certainties. Statutes existed for dealing with clear-cut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a probable anticompetitive effect were to be proscribed by this Act." See also *United States* v. *Pabst Brewing Co.,* 384 U. S., at 552; *United States* v. *Penn-Olin Chemical Co.,* 378 U. S. 158, 171 (1964).

The legislative history of § 7 makes plain that this was the intent of Congress. Before 1950, § 7 prohibited only those mergers which lessened competition "between the corporation whose stock is so acquired and the corporation making the acquisition." [11] The Celler-Kefauver Amendment, added in 1950, deleted these words and provided instead that all mergers which substantially lessened competition "in any line of commerce in any section of the country" were to be outlawed. See 64 Stat. 1126. Thus, whereas before 1950, § 7 proscribed only

---

[11] The original § 7 provided in relevant part: "[N]o corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce." 38 Stat. 731.

those mergers which eliminated present, actual competition between the merging firms, the Celler-Kefauver Amendment reached cases where future or potential competition in the entire relevant market might be adversely affected by the merger.[12]  "Section 7 of the Clayton Act was intended to arrest the anticompetitive effects of market power in their incipiency.  The core question is whether a merger may substantially lessen competition, and necessarily requires a prediction of the merger's impact on competition, present and future. . . .  The section can deal only with probabilities, not with certainties. . . .  And there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive

---

[12] The legislative history of the 1950 amendment was traced in detail in our opinion in *Brown Shoe Co.* v. *United States*, 370 U. S. 294 (1962).  "The deletion of the 'acquiring-acquired' test was the direct result of an amendment offered by the Federal Trade Commission.  In . presenting the proposed change, Commission Counsel Kelley made the following points: this Court's decisions had implied that the effect on competition between the parties to the merger was not the only test of the illegality of a stock merger; the Court had applied Sherman Act tests to Clayton Act cases and thus judged the effect of a merger on the industry as a whole; this incorporation of Sherman Act tests, with the accompanying 'rule of reason,' was inadequate for reaching some mergers which the Commission felt were not in the public interest; and the new amendment proposed a middle ground between what appeared to be an overly restrictive test insofar as mergers between competitors were concerned, and what appeared to the Commission to be an overly lenient test insofar as all other mergers were concerned.  Congressman Kefauver supported this amendment and the Commission's proposal was then incorporated into the bill which was eventually adopted by the Congress.  See Hearings [before Subcommittee No. 2 of the House Committee on the Judiciary] on H. R. 515, [80th Cong., 1st Sess.] at 23, 117–119, 238–240, 259; Hearings before a Subcommittee of the Senate Judiciary Committee on H. R. 2734, 81st Cong., 1st Sess. . . . 147."  370 U. S., at 317 n. 30.

action before § 7 can be called into play. If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated." *FTC v. Procter & Gamble Co.*, 386 U. S., at 577.

## B. Modes of Potential Competition

Since 1950, we have repeatedly applied § 7 to cases where the merging firms competed in the same line of commerce, and we have been willing to define the line of commerce liberally so as to reach anticompetitive practices in their "incipiency." See, *e. g., United States* v. *Phillipsburg National Bank*, 399 U. S. 350 (1970); *United States* v. *Pabst Brewing Co.*, 384 U. S. 546 (1966); *United States* v. *Aluminum Co. of America*, 377 U. S. 271 (1964); *United States* v. *Philadelphia National Bank*, 374 U. S. 321 (1963); *Brown Shoe Co.* v. *United States*, 370 U. S. 294 (1962). But in keeping with the spirit of the Celler-Kefauver Amendment, we have also applied § 7 to cases where the acquiring firm is outside the market in which the acquired firm competes. These cases fall into three broad categories which, while frequently overlapping, can be dealt with separately for analytical purposes.

*1. The Dominant Entrant.*—In some situations, a firm outside the market may have overpowering resources which, if brought to bear within the market, could ultimately have a substantial anticompetitive effect. If such a firm were to acquire a company within the relevant market, it might drive other marginal companies out of business, thus creating an oligopoly, or it might raise entry barriers to such an extent that potential new entrants would be discouraged from entering the market. Cf. *Ford Motor Co.* v. *United States*, 405 U. S. 562, 567–568 (1972); *FTC* v. *Procter & Gamble Co.*, 386

U. S., at 575.[13]   Such a danger is especially intense when the market is already highly concentrated or entry barriers are already unusually high before the dominant firm enters the market.

*2. The Perceived Potential Entrant.*—Even if the entry of a firm does not upset the competitive balance within the market, it may be that the removal of the firm from the fringe of the market has a present anticompetitive effect.   In a concentrated oligopolistic market, the presence of a large potential competitor on the edge of the market, apparently ready to enter if entry barriers are lowered, may deter anticompetitive conduct within the market. As we pointed out in *United States* v. *Penn-Olin Chemical Co.,* 378 U. S., at 174: "The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market [is] a substantial incentive to competition which cannot be underestimated."   From the perspective of the firms already in the market, the possibility of entry by such a lingering firm may be an important consideration in their pricing and marketing decisions.   When the lingering firm enters the market by acquisition, the competitive influence exerted by the firm is lost with no offsetting gain through an increase in the number of companies seeking a share of the relevant market.   The result is a net de-

---

[13] To be sure, in terms of anticompetitive effects, the dominant firm's acquisition of another firm within the market might be functionally indistinguishable from a *de novo* entry, which § 7 does not forbid.   But "surely one premise of an antimerger statute such as § 7 is that corporate growth by internal expansion is socially preferable to growth by acquisition."   *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 370 (1963).   Moreover, entry by acquisition has the added evil of eliminating one firm in the market and thus increasing the burden on the remaining firms which must compete with the dominant entering firm.

crease in competitive pressure.[14]  Cf. *United States* v.
*El Paso Natural Gas Co.*, 376 U. S. 651, 659–660 (1964).

3. *The Actual Potential Entrant.*—Since the effect of
a perceived potential entrant depends upon the percep-
tion of those already in the market, it may in some cases
be difficult to prove.  Moreover, in a market which is
already competitive, the existence of a perceived potential
entrant will have no present effect at all.[15]  The entry
by acquisition of such a firm may nonetheless have an
anticompetitive effect by eliminating an actual potential
competitor.  When a firm enters the market by acquiring
a strong company within the market, it merely assumes
the position of that company without necessarily increas-
ing competitive pressures.  Had such a firm not entered
by acquisition, it might at some point have entered *de*

---

[14] Thus, whereas the practical difference between entry by acquisi-
tion and entry *de novo* may be marginal in the case of a dominant
entrant, see n. 13, *supra*, it is crucial in the case of a perceived
potential entrant.  If the perceived potential entrant enters *de novo*,
its deterrent effect on anticompetitive practices remains and the
total number of firms competing for market shares increases.  But
when such a firm enters by acquisition, it merely steps into the
shoes of the acquired firm.  The result is no net increase in the
actual competition for market shares and the removal of a threat
exerting procompetitive influence from outside the market.

[15] Still, even if the market is presently competitive, it is pos-
sible that it might grow less competitive in the future.  For ex-
ample, a market might be so concentrated that even though it is
presently competitive, there is a serious risk that parallel pricing
policies might emerge sometime in the near future.  In such a situa-
tion, an effective competitor lingering on the fringe of the market—
what might be called a *potential* perceived potential entrant—
could exert a deterrent force when anticompetitive conduct is about
to emerge.  As its very name suggests, however, such a firm would
be still a further step removed from the exertion of actual, present
competitive influence, and the problems of proof are compounded
accordingly—particularly in light of the showing of reasonable
probability required under § 7.

*novo.* An entry *de novo* would increase competitive pressures within the market, and an entry by acquisition eliminates the possibility that such an increase will take place in the future. Thus, even if a firm at the fringe of the market exerts no present procompetitive effect, its entry by acquisition may end for all time the promise of more effective competition at some future date.

Obviously, the anticompetitive effect of such an acquisition depends on the possibility that the firm would have entered *de novo* had it not entered by acquisition. If the company would have remained outside the market but for the possibility of entry by acquisition, and if it is exerting no influence as a perceived potential entrant, then there will normally be no competitive loss when it enters by acquisition. Indeed, there may even be a competitive gain to the extent that it strengthens the market position of the acquired firm.[16] Thus, mere entry by acquisition would not prima facie establish a firm's status as an actual potential entrant. For example, a firm, although able to enter the market by acquisition, might, because of inability to shoulder the *de novo* start-up costs, be unable to enter *de novo*. But where a powerful firm is engaging in a related line of commerce at the fringe of the relevant market, where it has a strong incentive to enter the market *de novo,* and where it has the financial capabilities to do so, we have not hesitated to ascribe to it the role of an actual potential entrant. In such cases, we have held that § 7 prohibits an entry by acquisition since such an entry eliminates the possibility of future actual competition which would occur if there were an entry *de novo.*

---

[16] However, if the acquired firm is strengthened to such an extent that it upsets the market balance and drives its competitors out of the market, the acquiring firm takes on the characteristics of a dominant entrant, and the merger may therefore violate § 7 under that theory. See *supra,* at 558–560 and n. 14.

In light of the many decisions to this effect, the majority's assertion that "the Court has not squarely faced [this] question" is inexplicable. In *United States* v. *Continental Can Co.*, 378 U. S. 441 (1964), for example, the defendant argued that "the types of containers produced by Continental and Hazel-Atlas [the acquired firm] at the time of the merger were for the most part not in competition with each other and hence the merger could have no effect on competition." *Id.*, at 462. But MR. JUSTICE WHITE, writing for the Court, rejected that argument, holding that "[i]t is not at all self-evident that the lack of current competition between Continental and Hazel-Atlas for some important end uses of metal and glass containers significantly diminished the adverse effect of the merger on competition. Continental might have concluded that it could effectively insulate itself from competition by acquiring a major firm *not presently directing its market acquisition efforts toward the same end uses as Continental, but possessing the potential to do so.*" *Id.*, at 464 (emphasis added). The majority says it is "only arbitrary" to read this language as not referring to Hazel-Atlas' present procompetitive influence on the market. But the *Continental Can* Court said not a word about present procompetitive effects, and, indeed, made clear that it was relying on the future anticompetitive impact of the merger. The Court held, for example, that "the fact that Continental and Hazel-Atlas were not substantial competitors of each other for certain end uses at the time of the merger may actually enhance the *long-run tendency* of the merger to lessen competition." *Id.*, at 465 (emphasis added). See also *Ford Motor Co.* v. *United States,* 405 U. S. 562 (1972); *FTC* v. *Procter & Gamble Co.*, 386 U. S. 568 (1967); *United States* v. *Penn-Olin Chemical Co.*, 378 U. S. 158 (1964); *United States* v. *El Paso Natural Gas Co.*, 376 U. S. 651 (1964).

## C. Problems of Proof—The Role of Subjective Evidence

Although § 7 deals with probabilities, not ephemeral possibilities, all forms of potential competition involve future events and all of them are, therefore, to some extent speculative and uncertain. Whether future competition will be reduced by a present merger is clearly "not the kind of question which is susceptible of a ready and precise answer in most cases. It requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their 'incipiency.' " *United States* v. *Philadelphia National Bank,* 374 U. S., at 362.

The unavoidable problems of proof are compounded in some cases by the relevance of subjective statements of future intent by the managers of the acquiring firm. Although not susceptible of precise analysis, the objective conditions of the market may at least be measured and quantified. But there exists no very good way of evaluating a subjective statement by the manager of a firm that the firm does or does not intend to enter a given market at some future date.

Fortunately, in two of the three forms of potential competition, such subjective evidence has no role to play. Clearly, in the case of a dominant entrant, the only issue is whether the firm's entry by acquisition will so upset objective market forces as to substantially reduce future competition. Since the firm will have already taken steps to enter the market by the time a § 7 action is filed, its statements of subjective intent are irrelevant.

Similarly, when the Government proceeds on the theory that the acquiring firm is a perceived potential entrant, testimony as to the subjective intent of the acquiring firm is not probative. The perceived potential entrant exerts a procompetitive effect because companies in the market *perceive* it as a potential entrant. The companies in the market may entertain this perception whether the perceived potential entrant is *in fact* a potential entrant or not. Thus, a firm on the fringe of the market may exert a procompetitive effect even if it has no intention of entering the market, so long as it seems to those within the market that it may have such an intention.[17] It follows that subjective testimony by the managers of the perceived potential entrant is irrelevant.[18]

However, subjective statements of management are probative in cases where the acquiring firm is alleged to be an actual potential entrant. First, management's statements that it does not intend to make a *de novo* market entry, together with its associated reasons, provide an expert judgment on the conclusions to be drawn

---

[17] Thus, in *United States* v. *Penn-Olin Chemical Co.*, 378 U. S. 158 (1964), for example, management testified that the company had no intention of making a *de novo*, nonacquisitive entry, *id.*, at 166, and in part on the basis of this testimony, the District Court found that such an entry was unlikely, *id.*, at 173. But we rejected this finding as irrelevant to the company's status as a perceived potential entrant since "the corporation . . . might have remained at the edge of the market, continually threatening to enter," *ibid.*, and so affected competition within the market.

[18] Public statements by management that the firm does not intend to enter the market may be relevant. To the extent that such statements are believed by the firms within the market, they affect their perception of the firm outside the market as a potential entrant. But in that event, the statements of intent are admissible, not to show subjective state of mind, but, rather, as one of the objective factors controlling the perception of the firms within the market.

by the trier of fact from the objective market forces. Just as the Government may introduce expert testimony to inform and guide the trial court with respect to the appropriate business judgments to be derived from the objective data, so too the defendant is entitled to present the evaluation of its own "experts" who may include its management personnel. Although such evidence from management is obviously biased and self-serving, it is nonetheless admissible to prove that the objective market pressures do not favor a *de novo* entry.

More significantly, management's statement of subjective intent, if believed, affects the firm's status as an actual potential entrant. As indicated above, the actual potential entrant's entry by acquisition is anticompetitive only if it eliminates some future possibility that it might have entered *de novo*. An unequivocal statement by management that it has absolutely no intention of entering the market *de novo* at any time in the future is relevant to the issue of whether the possibility of such an entry exists. After all, the character of management is itself essentially an objective factor in determining whether the acquiring firm is an actual potential entrant.

But although subjective evidence is probative and admissible in actual potential-entry cases, its utility is sharply limited. We have certainly never suggested that subjective evidence of likely future entry is *required* to make out a § 7 case. On the contrary, in *United States* v. *Penn-Olin Chemical Co.*, 378 U. S., at 175, where the objective evidence of potential entry was strong, we said, *"Unless we are going to require subjective evidence,* this array of probability certainly reaches the prima facie stage. As we have indicated, to require more would be to read the statutory requirement of reasonable probability into a requirement of certainty. This we will not do." (Emphasis added.)

Nor do our prior cases hold that the district courts are bound by subjective statements of company officials that they have no intention of making a *de novo* entry. We have emphasized that the decision whether the acquiring firm is an actual potential entrant is, in the last analysis, an independent one to be made by the trial court on the basis of all relevant evidence properly weighted according to its credibility. Thus, in *FTC* v. *Procter & Gamble Co.*, for example, managers of Procter & Gamble testified that they had no intention of making a *de novo* entry, and the Court of Appeals thought itself bound by that testimony. See 386 U. S., at 580, and *id.*, at 585 (Harlan, J., concurring). We reversed, holding that "[t]he evidence . . . clearly shows that Procter was the most likely entrant." *Id.*, at 580.

As these cases indicate, subjective evidence has, at best, only a marginal role to play in actual potential-entry cases. In order to make out a prima facie case, the Government need only show that objectively measurable market data favor a *de novo* entry and that the alleged potential entrant has the economic capability to make such an entry. To be sure, the defendant may then introduce subjective testimony in rebuttal, and in the rare case where the objective evidence is evenly divided, it is conceivable that extremely credible subjective evidence might tip the balance. But where objectively measurable market forces make clear that it is in a firm's economic self-interest to make a *de novo* entry and that the firm has the economic capability to do so, I would hold that it is error for the District Court to conclude that the firm is not an actual potential entrant on the basis of testimony by company officials as to the firm's future intent.[19]

---

[19] It might be argued that economic decisions are "inherently subjective" and that any attempt to derive objective conclusions from

The reasons for so limiting the role of subjective evidence are not difficult to discern. Such evidence should obviously be given no weight if it is not credible. But it is in the very nature of such evidence that in the

economic data is futile. If this observation means that different people reach different conclusions from the same objective data, then the point must, of course, be conceded. Similarly, if the point is that economic predictions are difficult and fraught with uncertainty, it is well taken. As we recognized in *United States* v. *Philadelphia National Bank,* such questions are "not . . . susceptible of a ready and precise answer in most cases." 374 U. S., at 362. But although the factual controversies in § 7 cases may prove difficult to resolve, the statutory scheme clearly demands their resolution. As this Court held years ago, in response to a similar argument: "So far as the arguments proceed upon the conception that in view of the generality of the statute it is not susceptible of being enforced by the courts because it cannot be carried out without a judicial exertion of legislative power, they are clearly unsound. The statute certainly generically enumerates the character of acts which it prohibits and the wrong which it was intended to prevent. The propositions therefore but insist that . . . it never can be left to the judiciary to decide whether in a given case particular acts come within a generic statutory provision. But to reduce the propositions, however, to this their final meaning makes it clear that in substance they deny the existence of essential legislative authority and challenge the right of the judiciary to perform duties which that department of the government has exerted from the beginning." *Standard Oil Co.* v. *United States,* 221 U. S. 1, 69–70 (1911). Section 7 by its terms requires the trial judge to make a prediction, and it is entirely possible that others may reasonably disagree with the conclusion he reaches. But a holding that the fact of such disagreement requires the judge to delegate his decision-making authority to one of the parties would strike at the heart of the very notion of judicial conflict resolution. While it may be true that different people see economic facts in different light, § 7 gives federal judges and juries the responsibility to reach *their* conclusions as to the economic facts. And "[i]f justice requires the fact to be ascertained, the difficulty of doing so is no ground for refusing to try." O. Holmes, The Common Law 48.

usual case it is not worthy of credit.[20]   First, any statement of future intent will be inherently self-serving.   A defendant in a § 7 case such as this wishes to enter the market by acquisition and its managers know that its ability to do so depends upon whether it can convince a court that it would not have entered *de novo* if entry by acquisition were prevented.   It is thus strongly in management's interest to represent that it has no intention of entering *de novo*—a representation which is not subject to external verification and which is so speculative in nature that it could virtually never serve as the predicate for a perjury charge.

Moreover, in a case where the objective evidence strongly favors entry *de novo,* a firm which asks us to believe that it does not intend to enter *de novo* by implication asks us to believe that it does not intend to act in its own economic self-interest.   But corporations are, after all, profit-making institutions, and, absent special circumstances, they can be expected to follow courses of action most likely to maximize profits.[21]   The

---

[20] The Government directs our attention to a case which dramatically illustrates the unreliable character of such evidence. When the Government challenged Bethlehem Steel's acquisition of Youngstown Steel in a § 7 proceeding, Bethlehem vigorously argued that it would never enter the Midwestern steel market *de novo.* But when the merger was disallowed, see *United States* v. *Bethlehem Steel Corp.,* 168 F. Supp. 576 (SDNY 1958), Bethlehem nonetheless elected to make a *de novo* entry.   See Moody's Industrial Manual 2861 (1966).

[21] It is possible to imagine a small, closely held corporation which is not solely concerned with profit maximization and which through excessive conservatism or inertia would not seize upon an opportunity to expand its profits.   But such a corporation is exceedingly unlikely to become the defendant in a § 7 lawsuit.   Section 7 suits of this type are triggered when a firm tries to expand its market by entering hitherto foreign territory by acquisition.   A firm caught

trier of fact should, therefore, look with great suspicion upon a suggestion that a company with an opportunity to expand its market and the means to seize upon that opportunity will follow a deliberate policy of self-abnegation if the route of expansion first selected is legally foreclosed to it.

Thus, in most cases, subjective statements contrary to the objective evidence simply should not be believed. But even if the threshold credibility gap is breached, it still does not follow that subjective statements of future intent should outweigh strong objective evidence to the contrary. Even if it is true that management has no present intent of entering the market *de novo*, the possibility remains that it may change its mind as the objective factors favoring such entry are more clearly perceived. Of course, it is possible that management will adamantly continue to close its eyes to the company's own self-interest. But in that event, the chance remains that the stockholders will install new, more competent officers who will better serve their interests. All of these possibilities are abruptly and irrevocably aborted when the firm is allowed to enter the market by acquisition. And while it is conceivable that none of the possibilities will materialize if entry by acquisi-

---

in the act of expanding by acquisition can hardly be heard to say that it is uninterested in expansion.

It is also possible that a firm might make a good-faith error as to the nature of objective market forces. Thus, even though the objective factors favor entry *de novo*, the firm's managers might *think* that the same factors are unfavorable. But as the objective evidence favoring entry becomes stronger, the possibility of good-faith error correspondingly decreases, so that if the objective forces favoring entry are clear, the chance of good-faith error becomes *de minimis*. Moreover, the mere fact that a firm is presently making a good-faith error does not demonstrate that it will continue to do so in the future. See *supra,* this page.

tion is prevented, it is absolutely certain that they will not materialize if such entry is permitted. All that is necessary to trigger a § 7 violation is a finding by the trial court of a reasonable chance of future competition. In most cases, strong objective evidence will be sufficient to create such a chance despite even credible subjective statements to the contrary.[22]

To summarize, then, I would not hold that subjective evidence may never be considered in the context of an actual potential-entry case. Such evidence should always be admissible as expert, although biased, commentary on the nature of the objective evidence. And in a rare case, the subjective evidence may serve as a counterweight to weak or inconclusive objective data. But when the district court can point to no compelling reason why the subjective testimony should be believed or when the objective evidence strongly points to the feasibility of entry *de novo,* I would hold that it is error for the court to rely in any way upon management's subjective statements as to its own future intent.

### III

As indicated above, the Government failed to press the argument that Falstaff was a dominant or perceived potential entrant. Since there is virtually no evidence in the record to support either of these theories, I cannot

---

[22] The distinction between subjective statements of intent and objectively verifiable facts is not unknown in other areas of the law. See, *e. g., Wright* v. *Council of City of Emporia,* 407 U. S. 451, 460–462 (1972); *NLRB* v. *Erie Resistor Corp.,* 373 U. S. 221, 227–228 (1963). Indeed, perhaps the oldest rule of evidence—that a man is presumed to intend the natural and probable consequences of his acts—is based on the common law's preference for objectively measurable data over subjective statements of opinion and intent. Nor have we hesitated to apply this principle to antitrust law. See, *e. g., Utah Pie Co.* v. *Continental Baking Co.,* 386 U. S. 685, 702–703 (1967); *United States* v. *Gypsum Co.,* 333 U. S. 364, 394 (1948).

say that the District Judge erred in rejecting them. It does appear, however, that he applied an erroneous standard in evaluating the subjective evidence relevant to Falstaff's position as an actual potential entrant and that this error infected the court's factual determinations. I would therefore remand the cause so that a proper fact-finding can be made.

The record shows that the New England market is highly concentrated with a few large firms gaining a greater and greater share of the market. Although this market structure has yet to produce overtly anticompetitive behavior, there is a real danger that parallel pricing and marketing policies will soon emerge if new competitors do not enter the field.

The objective evidence in the record strongly suggests that Falstaff had both the capability and the incentive to enter the New England market *de novo*. It is undisputed that it was in Falstaff's interest to gain the status of a national brewer in the near future and that New England was a logical area to begin its expansion. Indeed, Falstaff's own actions in entering the New England market support this conclusion. Nor can it be doubted that Falstaff had the economic capability to enter New England. Falstaff is the Nation's fourth largest brewer and the largest still outside of New England. It has been consistently profitable in recent years, has an excellent credit rating, and had, in 1964, enough excess capital to finance a 10-year, $35 million expansion project. The Little Report concluded that *de novo* entry into the Northeast was feasible and, although Falstaff attacks these findings, the trier of fact might well have accepted them had he relied upon the objective evidence.

To be sure, Falstaff introduced a great deal of evidence tending to show that entry *de novo* would have been less profitable for it than entry by acquisition.

I have no doubt that this is true. Indeed, if it can be assumed that Falstaff is a rational, profit-maximizing corporation, its own decision offers strong proof that entry by acquisition was the preferable alternative. But the test in § 7 cases is not whether anticompetitive conduct is profit maximizing. The very purpose of § 7 is to direct the profit incentive into channels which are procompetitive. Thus, the proper test is whether Falstaff would have entered the market *de novo* if the preferable alternative of entry by acquisition had been denied it. The objective evidence strongly suggests that such an entry would have occurred.

The District Court, however, chose to ignore this objective evidence almost totally. Instead, the trial judge seems to have considered himself bound by Falstaff's subjective representations that it had no intention of entering the market *de novo*. As noted above, even if these subjective statements are credible, they appear to be insufficient to outweigh the strong objective evidence to the contrary.

Findings of fact are, of course, for the trial judge in the first instance, and even in antitrust cases where the evidence is largely documentary, appellate courts should be reluctant to set them aside. But when the facts are found under a standard which is legally deficient, the situation is fundamentally different. It is the duty of appellate courts to establish the legal standards by which the facts are to be judged. The facts in this case were judged by a wrong standard, and the cause should therefore be remanded for a new, error-free determination.

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE STEWART concurs, dissenting.

Civil litigation in our common-law system is conducted within the framework of the time-honored principle that the plaintiff must introduce sufficient evidence to con-

vince the trier of fact that his claim for relief is factually meritorious. However large the societal interest in the area of antitrust law, so long as Congress assigns the vindication of those interests to civil litigation in the federal courts, antitrust litigation is no exception to that rule. The plaintiff, whether public or private, must prove to the satisfaction of the judge or jury that the defendant violated the antitrust laws. *United States v. Yellow Cab Co.,* 338 U. S. 338 (1949). It is the exclusive responsibility of the trier of fact to weigh, as he sees fit, all admissible evidence in resolving disputed issues of fact, *ibid.,* and his findings of fact cannot be overturned on appeal unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.,* 333 U. S. 364, 395 (1948). Cf. *FTC v. Procter & Gamble Co.,* 386 U. S. 568 (1967). The Court today simply disregards these principles.

The Court remands this case to the District Court to consider "whether Falstaff was a potential competitor in the sense that it was so positioned on the edge of the market that it exerted beneficial influence on competitive conditions in that market." *Ante,* at 532–533. The antitrust theory underlying the remand is that the competitors in the relative geographic market, aware of Falstaff's presence on the periphery, would not exercise their ostensible market power to raise prices because of the possibility that Falstaff, sufficiently tempted by the high prices in that market, would enter. A Government suit challenging a merger or acquisition can, of course, be premised on this theory, and, if sufficient evidence to convince the trier of fact is introduced, the determination that the merger or acquisition violated § 7 would not be reversed on appeal.

As my Brother MARSHALL convincingly demonstrates, however, in this case the Government neither proceeded on the theory advanced by the Court nor introduced *any*

574

evidence that would support that theory. The theory that the Government did advance, and upon which it offered its evidence, is concisely summarized in the Government's statement in opposition to Falstaff's motion to dismiss.

"In our opening statement we attempted to show that the Government would prove—and I believe we have—that Falstaff, the fourth largest brewing corporation in the nation, had a continuous intensive interest in entering New England; that it carried on negotiations for five years with companies serving New England; that alternative methods of entry other than the acquisition of the largest New England brewer were available to Falstaff; and that it was in fact one of a few and the most likely entrant into this market; that its entrance into this market was especially important because the market is concentrated; that is, the sales of beer in New England are highly concentrated in the hands of the relatively few number of brewers.

"The entry by Falstaff by building a brewery, by shipping into this market, and opening it up, by the acquisition of a company less than number 1, thereby eliminating its most significant potential competitor, were all available to it. Because of the concentration in the market and because of Falstaff's being the most potential entrant, the acquisition by Falstaff of the leading firm in this market eliminated what we consider to be one of a few potential competitive effects that this market could expect for years." Transcript, Vol. 3, p. 7.

For this Court to reverse and to remand for consideration of a possible factual basis for a theory never advanced by the plaintiff is a drastic and unwarranted departure from the most basic principles of civil litigation

and appellate review. In this case, the Government originally advanced one theory, but failed to introduce sufficient evidence to convince the trier of fact. That failure is "a not uncommon form of litigation casualty, from which the Government is no more immune than others." *United States* v. *Yellow Cab Co.*, 338 U. S., at 341. The Court now resuscitates this "casualty" by use of a theory transplant, allowing the Government a second opportunity to vindicate its position by arguing a different theory not originally propounded before the District Court or on appeal. I cannot join in the Court's rescue operation for this "litigation casualty," an operation which succeeds only by flagrantly disregarding some of the axioms upon which our judicial system is founded.

Although agreeing with my Brother MARSHALL's criticism of the Court's reason for remanding this case, I cannot agree with his grounds for remanding to the District Court for reconsideration. That theory is based, erroneously I believe, on the notion that there is an identifiable difference between "objective" and "subjective" evidence in an antitrust case such as this. My Brother MARSHALL would have the District Court weigh "objective" evidence more heavily than "subjective" evidence. In the field of economic forecasting in general, and in the area of potential competition in particular, however, the distinction between "objective" and "subjective" evidence is largely illusory. It is, I believe, incorrect to state that a trier of fact can determine "objectively" what "is in a firm's economic self-interest." Such a determination is guesswork. The term "economic self-interest" is a convenient shorthand for describing the economic decision reached by an individual or firm, but does not connote some simple, mechanical formula which determines the input values, or their assigned weight, in the process of economic decisionmaking. The simple fact is that any economic decision is largely sub-

jective. In the instant case, Falstaff sought to prove why it was not in the "economic self-interest" of that firm to enter a new geographic market without an established distribution system. Its explanation is as "objective" as any of the evidence offered by the Government to show why a hypothetical Falstaff should enter the market. The question of who is an "actual potential competitor" is entirely factual. In deciding questions of fact, it is the province of the trier to weigh all of the evidence; but it is peculiarly his province to determine questions of credibility.

> "Findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them. . . .
>
> ". . . There is no exception [to the 'clearly erroneous' rule of appellate review] which permits [the Government], even in an antitrust case, to come to this Court for what virtually amounts to a trial *de novo* on the record of such findings as intent, motive and design." *United States* v. *Yellow Cab Co.,* 338 U. S., at 341–342.

I would not ignore our prior decisions or rewrite the rules of evidence simply to afford the Government a second chance, which is uniformly denied to other litigants, to convince the trier of fact.