**UNITED STATES of America,**
**Plaintiff,**

v.

**FALSTAFF BREWING CORPORA-**
**TION et al., Defendants.**

Civ. A. No. 3523.

United States District Court,
D. Rhode Island.

Oct. 23, 1974.

Norman H. Seidler, Dept. of Justice, Anti-trust Div., Phillip F. Cody, Bruce Repetto, Kenneth A. Sagat, U. S. Dept. of Justice, Anti-trust Div., New York City, Lincoln C. Almond, U. S. Atty., Providence, R. I., for plaintiff.

James S. McClellan, Jerome M. McLaughlin, Wilson, Cunningham & McClellan, St. Louis, Mo., Matthew W. Goring, Stephen J. Carlotti, Hinckley, Allen, Salisbury & Parsons, Providence, R. I., for Falstaff.

## OPINION

DAY, District Judge.

In this action the Government seeks to set aside the acquisition by the defendant Falstaff Brewing Corporation (hereinafter Falstaff) of the assets of Narragansett Brewing Company (hereinafter Narragansett) on the ground that said acquisition was a violation of Section 7 of the Clayton Act, as amended, 15 U.S. C. § 18 because it eliminated substantial potential competition in the production and sale of beer in the New England beer market.[1]

---

1. Section 7 reads in pertinent part as follows:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

After a trial following extensive and prolonged discovery proceedings by the parties, I found that Falstaff was not a potential entrant into said market by any means or way except by the acquisition of Narragansett. I further found that it is not probable that said acquisition may substantially lessen competition in said New England beer market and entered judgment in favor of the defendant. United States v. Falstaff Brewing Corporation, et al., 332 F.Supp. 970 (D.C.R.I.1971). The Government appealed directly to the Supreme Court under the Expediting Act, 32 Stat. 823, 15 U.S.C. § 29. The Supreme Court vacated said judgment and remanded said action to this Court for further proceedings consistent with its opinion. United States v. Falstaff Brewing Corp. et al., 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973). Its mandate on remand was for "proper assessment of Falstaff as an on-the-fringe potential competitor". Ibid. 537, 93 S.Ct. at 1103.

Following said remand the Government did not seek to present any additional evidence and by stipulation of counsel for the parties and the order of this Court, the evidence in this action has been limited to that contained in the original record of said trial. The sole issues for determination by this Court are whether the defendant was a potential competitor waiting in the wings, exerting a beneficial influence on existing competition in said New England market, and, if so, whether the acquisition of Narragansett would probably lead to a substantial lessening of competition in said market.

The parties had stipulated as to the concentration figures and the market shares of the firms selling in said market at the time of the acquisition of Narragansett by the defendant. Based upon these stipulations, the Supreme Court found that:

"While beer sales in New England increased approximately 9.5% in the four years preceding the acquisition, the eight largest sellers increased their share of those sales from approximately 74% to 81.2%. In 1960 approximately 50% of the sales were made by the four largest sellers; by 1964, their share of the market was 54% and by 1965, the year of acquisition, their share was 61.3%. The number of brewers operating plants in the geographic market decreased from 32 in 1935 to 11 in 1957, to six in 1964.

Of the Nation's 10 largest brewers in 1964, only Falstaff and two others did not sell beer in New England; Falstaff was the largest of the three and had the closest brewery. In relation to the New England market, Falstaff sold its product in western Ohio, to the west, and in Washington, D. C., to the south." 410 U.S. 527, 528, 93 S.Ct. 1096, 1098.

■ Upon these facts the Government contends that the defendant's acquisition of Narragansett created a "reasonable likelihood that competition in the New England market would be substantially lessened". In this case the Government has also contended that concentration per se is evidence of lack of competition in the market. In my opinion a better approach was that taken by the late Mr. Justice Harlan in his concurring opinion in F.T.C. v. Proctor & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) wherein he stated at page 594, 87 S.Ct. at page 1238:

"Just as the total number of sellers in the market is not determinative of its operation, the percentage of sales made by any group of sellers is similarly not conclusive. The determinative issue is, instead, how the sellers interact and establish the pattern of market behavior. The significance of concentration analysis is that it allows measurement of one easily determined variable to serve as an *opening key* to the pattern of market behavior." (Emphasis supplied).

Beyond evidence of concentration, the Government presented no evidence tending to prove "deviation from competitive norms" in the New England beer market. Dr. Horowitz, an economist, testifying in behalf of the defendant, stated

unequivocally that there is no necessary relationship between concentration and the level of competition in said market. On the contrary, he stated a number of factors which should be considered in ascertaining the level of competition, viz., pricing behavior, willingness to innovate and keep up with technological changes, stability of market shares and quality of product.

In his testimony he pointed out that since 1955, while the market shares of the leading sellers in said New England market had increased, it was only as the result of the rapidly increasing shares of Schlitz and Anheuser-Bush. The shares of other leaders in said market had varied which was consistent with competitive conditions. In addition, prices remained constant in spite of rising costs, another indication of strong competitive forces in said market in his opinion. Although counsel for the Government requested and was granted permission to have two economists of his choice sit with him at counsel table to assist him during the trial of this case, neither of said economists was called as a witness to refute the testimony or opinions of Dr. Horowitz.

The evidence further showed that technological innovations were being studied and undertaken by Falstaff before and after said acquisition which are indicative of the existence of vigorous competition among the sellers in said market.

The Government contends that the decline in the number on brewers operating breweries in said market indicates decreased competition therein. Those brewers who ceased to do business in said market were too inefficient to compete with other firms who in the words of Dr. Horowitz were "fighting for their share of the market".

 No evidence was presented by the Government which would tend to show that competition in said market was other than vigorous. Furthermore, there was no showing by the Government that one or another firm in the market had control over prices or other competitive indicia. In the absence of such a showing, the Government has failed to prove that Falstaff was a "potential competitor with any influence on the competitive conditions in said market".

 Even if this Court were to conclude that said New England beer market could have benefited from the existence of a potential entrant therein, the burden rested upon the Government to prove in the words of Mr. Justice White that "[Falstaff] was so positioned on the edge of the market that it exerted beneficial influence on competitive conditions in that market". 410 U. S. 526, 532–533, 93 S.Ct. 1096, 1100, 35 L.Ed.2d 475. Mr. Justice White suggested two alternative methods of proving such effect. The first method would be to present evidence of how Falstaff was in fact perceived by companies then selling beer in said market. The only testimony relating to this issue was that of Carl Haffenreffer, the former Executive Vice-President and Director of Marketing of Narragansett. He testified as follows:

"They [Falstaff] were no threat. We certainly didn't consider them any threat to us. We had much greater threats to concern ourselves with." Haffenreffer, App. 376.

The Government presented no testimony of any sellers in said market in 1965 or previous thereto that Falstaff was considered by them to be a potential competitor in said market.

 The second method requires this Court to determine whether a rational beer merchant selling in said market could have reasonably concluded that Falstaff might build a new brewery in New England to supply said market. Relevant evidence on this issue to be evaluated includes Falstaff's general interest in said market, the distance of its brewery from said market, its prior acquisition discussions, its financial capability and incentives to enter said market, and also the objective evidence of

competitive conditions in said market, including a lack of price increases despite rising costs and the inability of those then selling in said market to exercise market control.

■ It is this Court's opinion that a rational evaluation of the objective facts known generally to firms selling in said market prior to and at the time of said acquisition by Falstaff warrants the conclusion that Falstaff would probably not have entered said market and hence its existence on the edge thereof could not have any pro-competitive effect on behavior in said market.

It is clear that the defendant had never concealed the fact that it was interested in becoming a national brewer. That fact cannot be said to warrant the inference that Falstaff's interest was directed primarily or solely to said New England market. The acquisition of Narragansett did not make Falstaff a national brewer. Horowitz, App. 291. Its decision to become a national brewer did not require that it enter the New England market.

The evidence establishes that between 1960 and 1964 Dawson, Ballentine, Liebmann and Narragansett initiated negotiations with Falstaff with the objective of being acquired by Falstaff. The evidence establishes that Dawson's offer was rejected summarily by Falstaff and the proposals by Ballentine and Liebmann eventually were non-productive and were terminated. Griesedieck, App. 138, 300–302. To some extent these negotiations were matters of public record. If these negotiations with Ballentine and Liebmann may be deemed to give rise to any inferences as to Falstaff's intent or objective, they reflect an interest in the New York market, not the New England market. Any beer seller having knowledge of said negotiations would conclude that Falstaff was not interested in building a brewery as a means of entering said New England market. However, although Ballentine and Liebmann sold in the New England market, their primary market was in the New York-Philadelphia metropolitan area. Under the circumstances, these discussions should have indicated to its competitors that Falstaff was not primarily interested in said New England market and that it did not intend to construct a brewery therein for the purpose of entering that market.

An obvious condition precedent to the construction of a brewery was adequate market penetration. Since the statistics relating to Falstaff's sales and capacity were generally available in the beer business, all sellers in said New England market at the time of said acquisition of Narragansett by Falstaff must have known that Falstaff was then operating its brewery at full capacity and therefore could not begin any penetration of said market by shipping to said market any excess production which it did not possess. Horowitz, App. 234.

Each of the brewers then selling in said market must have known that an adequate distribution system was a condition precedent to entry therein (Horowitz, App. 234) and that such a system was unavailable (Haffenreffer, App. 375). Falstaff had not even made tentative offers to distributors already selling in said market in response to unsolicited inquiries (App. 46, 470–535). In fact, Falstaff had not undertaken the most fundamental steps necessary for an effective entry by it in said market.

Without an acceptable level of sales in said market, Falstaff could not reasonably anticipate any profit therefrom. Under such circumstances, it is unlikely that Falstaff could have borrowed the money to build a brewery or undertaken to do so. Its President testified:

"In the first place, we had no sales in New England, and for us to have attempted to finance a brewery of the size of which we believed necessary, above a million barrels, there was no way that we could estimate to any degree of certainty what kind of sales we would generate after we built the brewery, and therefore it would have been rather a difficult thing for us in

my opinion to borrow the money. Certainly we never could have justified it to our stockholders, because we did find it very difficult to open in major metropolitan markets where entrenched rulers were already doing business without a decent distributor system. That is, the reason why we did acquire, it was the distributorship purely and simply." Griesedieck, App. 296.

The Government in its brief on remand contends that Falstaff could have acquired some other smaller brewery in said New England market at a significantly smaller cost and expanded it as success in said market permitted. In support of this contention it cites Dawson's Brewery Co., in New Bedford, Massachusetts and Diamond Spring Co. in Lawrence, Massachusetts, both of which were for sale and had made overtures for their acquisition to Falstaff. The evidence establishes that one of them was in bankruptcy at the time of said offer to Falstaff. Additionally, it must have been evident to other brewers in said market that neither of said brewers possessed an adequate distributor organization. It is inconceivable that other brewers in said market could have considered it probable that Falstaff would consider their acquisition as a possible means of entry into said market.

It is this Court's opinion that a review of all the evidence, viewed in the light of the economic situation in said market in 1965, confirms the statement of the said Carl Haffenreffer and the opinion of Dr. Horowitz that Falstaff exerted no influence on the level of prices or on the substantiality of competition in said market. The Government produced no evidence during said trial that any of the brewers selling in said market in 1965 viewed Falstaff as a potential entrant therein.

■ If, in fact, Falstaff by its existence was exerting some beneficial influence on competition in said beer market,

that in and of itself would be insufficient to prove a violation of said Section 7. As Mr. Justice White said:

"Surely, it could not be said on this record that Falstaff's general interest in the New England market was unknown; and if it would appear to rational beer merchants in New England that Falstaff might well build a new brewery to supply the northeastern market then its entry by merger became suspect under § 7." 410 U.S. 533, 93 S.Ct. 1101.

■ Even if Falstaff's entry into said New England market by merger became suspect, the burden rested upon the Government to prove that the probable result thereof would be to substantially lessen competition in said market. Brown Shoe Co., Inc. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

The record of this case shows that Falstaff acquired the assets of Narragansett on July 15, 1965. The instant action was filed on July 13, 1965 and service of process was made on Falstaff on July 21, 1965 at St. Louis, Missouri, where its principal place of business was located. After extensive and prolonged discovery by the parties, the trial of this action began on October 15, 1970.

■ It is well settled that post acquisition evidence in a case such as this may properly be considered in determining whether the probable effect of said merger will be a substantial lessening of competition in said New England beer market. United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966); F.T.C. v. Consolidated Foods Corp., 380 U.S. 592, 85 S. Ct. 1220, 14 L.Ed.2d 95 (1965); United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed. 2d 1057 (1957).

In its supplemental memorandum filed with this Court, the Government relies heavily upon the opinion of the Court in United States v. Phillips Petroleum Company, 367 F.Supp. 1226 (D.C.Cal.

1973). In that case the Court had two issues for decision, viz., (1) whether the defendant was a likely potential entrant into the California market, and (2) whether the defendant therein was waiting in the wings or, in the words of the Court, whether it had any "edge" effect on competition in said market. This Court has already found in favor of Falstaff on the first of these issues and it is not within the scope of said remand.

In Phillips the Court held that the criteria to be weighed in ascertaining whether Phillips had a pro-competitive edge effect were (1) was Phillips in the relevant line of Commerce; (2) had it previously indicated its interest in entering the California motor gasoline market; (3) were there objective economic facts indicating Phillips' capability to enter unilaterally; (4) were there objective economic facts indicating Phillips' incentives to enter said market; (5) was Phillips recognized by others selling in said California market as a potential entrant therein, and (6) were there objective economic facts relating to the structure and degree of concentration in said market and barriers to entry therein. The Court found from the evidence adduced at trial that Phillips had a well defined goal of nationwide marketing and had explored every possible means of entering said market, either by a large acquisition, joint venture, a foot-hold acquisition or a unilateral entry. By virtue of its acquisition of the Western Manufacturing and Marketing Division of Tidewater Oil Company for the sum of $366,000,000, Phillips would have achieved national marketing status, (2) would have entered a market regarded as more profitable than other areas in which it had the strongest representation and where prices had been more stable, and (3) would have gained opportunities for vertical integration, including exploitation of its Alaskan crude oil reserves, product exchanges and potential enlargment of its highly petrochemical business.

The evidence in said case further established that Phillips had a history of entering markets de novo or unilaterally. It had a record of internal growth which made it a leading international company with substantial interests in many parts of the world. The evidence further established that Phillips was engaged in business in California before it acquired said Division from Tidewater. It had exploration and production interests in said state and was engaged there in the manufacture and marketing of many plastic products, and in the packaging and marketing of fertilizers, full lines of rubber carbon, high-purity hydrocarbons and many speciality chemicals. Phillips was the second largest industrial firm located west of the Mississippi—surpassed only by Standard Oil of California.

The underwriters of Phillips in its acquisition of said Division from Tidewater did not consider said acquisition for the sum of $366,000,000 to be a particularly large one for a company of Phillips' size and concluded that superimposing said assets acquired from Tidewater on Phillips' balance sheet did not have a great effect.

In the instant case the evidence established that Falstaff's primary method of entry into new markets had been by acquisition. Falstaff was not and is not a nation-wide brewer. It possessed no unique research or managerial talent in comparison with other brewers. It was not active in said New England market prior to its acquisition of Narragansett. Its payment of $35,000,000 for the assets of Narragansett represented a substantial investment for it which in the absence of its distributor organization could not have been financed as shown by the evidence presented during said trial.

In Phillips, the Court found that the entry by Humble Oil and Refining Company into the California motor gasoline market was evidence of the feasibility of unilateral entry for a company with sufficient capability and motivation.

Said Court found there was no uniqueness in said California market. The Court noted that said entry by Humble demonstrated that service stations and other retail outlets could be obtained in sufficient numbers to support substantial entry into said market without resort to a major acquisition. It also found that Phillips could have supplied itself with gasoline in California through four alternative methods until it could complete construction of an oil refinery. At the time of its acquisition of Narragansett, Falstaff's breweries were operating at approximately 100% capacity and could not support its entry into said New England market pending the erection and completion of a new brewery in said market.

In Phillips, the Government presented substantial evidence that other companies in the California market regarded Phillips as a potential entrant therein and that Phillips had engaged in several well publicized efforts to gain control of Union Oil Company which was then doing business in said market. In the instant case, no evidence was presented to the effect that other companies then selling beer in the New England market regarded Falstaff as a potential entrant therein.

▬ While it is true that post-acquisition evidence cannot be employed to validate what is otherwise an illegal merger, such evidence may properly be used to confirm trends in the relevant market perceived at the time of the merger. In this case, the post-acquisition evidence establishes that after said acquisition of Narragansett by Falstaff competition remained intense in said New England market and that said acquisition did not lessen competition in said market in any manner or form. On the contrary, said post-acquisition evidence establishes that beer prices remained stable in spite of rising costs, that Narragansett's share of said market declined, and its profits declined despite its best efforts and the competition in said market became more intense. It is this Court's opinion that

United States v. Phillips, supra, is clearly distinguishable on its facts from this case.

The evidence presented in this case and the reasonable inferences to be drawn therefrom establish the following facts, viz.:

(1) The relevant geographic market consists of the New England states, i. e., Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont.

(2) In July, 1965, when Falstaff acquired Narragansett, the sales of Narragansett were almost exclusively in said New England market.

(3) At the time of said acquisition Falstaff did not sell any beer in said market and had no brand recognition or acceptance therein. It sold its products no closer to New England than Toledo, Ohio, on the west and Washington, D. C., on the south.

(4) In 1964, the eight largest sellers of beer in the New England market sold 81.2% of the beer sold in said New England market. In 1960, the eight largest sellers of beer therein sold 74% of the beer sold in said market. In 1965, Narragansett was the largest seller of beer with approximately 20% of the market.

(5) Since the date of said acquisition, Narragansett's share of said market has fallen and its profits have declined. Competition in said market has remained intense. Said merger has had no adverse effect on the level of competition in said market. Price competition is evidenced by the fact that prices have remained constant in spite of rising costs.

(6) At the time of said acquisition in 1965, none of the firms selling beer in said market had control over prices or other indicia of competition and therefore the level of competition would not be affected by the existence of a potential entrant on the fringe of said market.

(7) At the time of said acquisition and for the foreseeable future, the defendant could not have entered said New England market by shipping beer from its existing plants which were then operating at near capacity.

(8) Although Falstaff had publicly indicated its desire to become a national brewer, its acquisition of Narragansett did not make it a national brewer.

(9) Firms selling in said market prior to said acquisition were aware that the procurement of an adequate distributor system would have been extremely difficult if the defendant attempted to create one out of the then existing wholesale distributors.

(10) The only evidence presented during said trial establishes that at the time of said acquisition, competitors selling in said market did not view the defendant, Falstaff, as a potential or probable entrant in said market.

(11) Under the conditions then existing in said market, no rational beer seller in said market would have regarded Falstaff as a potential entrant therein at the time of said acquisition.

(12) The acquisition of Narragansett by Falstaff did not result in the elimination of a potential competitor so positioned on the edge of said market that it exerted a beneficial influence on competitive conditions therein.

Since the Government has failed to establish by a fair preponderance of the evidence that said acquisition of Narragansett by the defendant would probably lead to a substantial lessening of competition in the production and sale of beer in said New England market in violation of § 7 of said Clayton Act, judgment must be and will be entered in favor of the defendant, Falstaff Brewing Corporation.