UNITED STATES of America,
Plaintiff,

v.

WHITE CONSOLIDATED INDUS-
TRIES, INC.

and

White Motor Corporation, Defendants.

No. C71-91.

United States District Court,
N. D. Ohio, E. D.

Feb. 24, 1971.

William LeFaiver, David F. Hils, Gerald Rubin, John A. Weedon, Carl Steinhouse, Justice Dept., Cleveland, Ohio, for plaintiff.

George Meisel, Cleveland, Ohio, John H. Schafer, III, Washington, D. C., Rufus Day, Jr., Ward Smith, George Brown, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

White Motor Corporation (Motor) is an Ohio corporation, and White Consolidated Industries, Inc. (Consolidated), is a Delaware corporation, but based in Cleveland, Ohio. The two were originally one firm, but for most of this century have had separate identities. In recent years both firms have expanded greatly in size and scope: since 1953 Motor has acquired eight firms with assets of $231,000,000, while since 1960 Consolidated has made twenty nine acquisitions totaling $420,000,000. The effect of these several transactions has been to create two large firms, each of which—although well diversified—earns nearly half its revenues from non-electrical machinery sales.

This action was brought by the Government under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent the proposed merger of the defendant corporations. The Government charges that, if allowed to stand, the merger will violate Section 7 of that Act, 15 U.S.C. § 18, substantially lessening competition in several lines of commerce within the non-electrical machinery field. In view of this, the Government has moved for a preliminary injunction to halt the merger pending a trial on the merits after an opportunity for full discovery.

This case is not so much a contest between the United States Department of Justice and the two defendant companies as a skirmish in a broader battle over the direction American economic life will take in the coming years. At the center of this struggle is the concept of the conglomerate corporation—not a particularly new development, but one which lately has gained great momentum. One reason for its recent popularity is the attempt of companies to expand through acquisition of other firms, while avoiding the antitrust problems of vertical or horizontal mergers. The resulting corporations have had none of the earmarks of the traditional trust situation, but they have presented new problems of their own. Although the market shares of the several component firms within their individual markets remain unchanged in conglomerate mergers, their capital resources become pooled—concentrated into ever fewer hands. Economic concentration is economic power, and the Government is concerned that this trend, if left unchecked, will pose new hazards to the already much-battered competitive system in the United States.

The specific evil the Government is attacking here is reciprocal dealing—the use by a firm of its strength in one segment of the market to improve its position in another. Unlike recent cases in steel and other industries, the issue here is not overt reciprocity, but rather what the Government terms "reciprocity effect." This, simply, is an alleged tendency for prospective suppliers of a firm to direct their purchases to that firm in order to maintain its goodwill. The larger the firm, presumably, the greater its leverage in the market-place and the greater the danger to competition from this "reciprocity effect."

The entire concept of "reciprocity effect" is rather a new one and one whose very novelty has made the courts generally chary of accepting it. There is dicta by Judge Rosenberg in United States v. Ingersoll-Rand Co., 218 F.Supp. 530 (W.D.Pa., 1963) that the "judicious use" of the defendant's steel purchasing power could be used as a lever to aid sales by its subsidiaries to the steel industry. The Court there goes on to note that:

"Moreover, the mere existence of this purchasing power might make its conscious employment toward this end unnecessary; the possession of the power is frequently sufficient, as sophisticated businessmen are quick to see the advantages in securing the goodwill of the possessor." Id. at 552.

On appeal, this language was quoted with approval by the Third Circuit Court of Appeals, 320 F.2d 509, 524 (1963), but in general the theory has failed to gain acceptance outside that circuit. In Allis-Chalmers Mfg. Co. v. White Consolidated Industries, Inc., 414 F.2d 506 (C.C.A. 3, 1969), cert. den. 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501, that same court reversed the District Court's refusal to grant a preliminary injunction, and based its decision largely on the probability of an anti-competitive "reciprocal effect." The majority there found that Allis-Chalmers' annual steel mill products purchases of $44,000,000 added to White's $42,000,000 would give a competitive advantage to Blaw-Knox, a White subsidiary, in its sales of rolling mill equipment to the steel industry.

"An acquisition which creates a market structure conducive to reciprocal dealing presents the acquiring company with an advantage over competitors, an advantage which by its very nature is anticompetitive." 414 F.2d at 518.

Although this Court is not bound by decisions of the Court of Appeals for the Third Circuit, the logic of its opinion in the Allis-Chalmers case seems both inescapable and quite compelling. The result of a merger between the defendant corporations would be no less than a superconglomerate, whose impact upon the market can hardly be gauged. The undesirable effects of such a merger are totally unrelated to the motives of the parties; rather, their mere size in the market will operate as a lever which in turn will lessen competition. Unquestionably, other firms will hesitate to compete too zealously with one division

out of fear of antagonizing the entire firm and losing it as a customer for other goods. In particular, the combined steel purchases of White Consolidated and White Motors will aid Blaw-Knox in its sales of rolling-mill equipment to the steel industry. Since White Motor is a smaller purchaser of steel than Allis-Chalmers, the effect here will not be so drastic as in the earlier case—but the same forces can be seen operating here as in that case.

The defendants attempt to minimize the anti-competitive impact of their proposed merger by speaking of the so-called "profit-center" system under which they claim White Consolidated operates. Each division, they argue, is responsible only for its own internal profitability. As a result, the Court is told, no division will practice or encourage reciprocal dealing in favor of another, since this would harm its internal situation. The evidence and testimony presented to this Court, however, indicates a much firmer and more centralized control than the defendants would have us believe; and it would appear that it is the overall corporate profits, not divisional ones, which are of paramount importance to White Consolidated's central office.

This "profit-center" concept is also used to argue against the charge of vertical anti-competitive effects. Without finding it necessary to go into the extent of these effects at this time, it is noted parenthetically that it would seem patently beyond reason for a wholly-owned subsidiary of White Consolidated to go with any regularity to an outside firm to purchase goods available as well from White Consolidated itself or another of its subsidiaries. If nothing else, the requirements of regular reports from each division to the central office of major purchases surely would act as a rein to keep such purchases by and large within the family. In support of this, it appears that, since entering into the agreement to merge, White Consolidated has been pursuing an intensified sales program at White Motors, with the clear purpose of taking full advantage of the impending merger between the two firms. Such a policy is not, of course, anti-competitive in itself, but it does serve to indicate the inevitable impact the merger will have.

The defendant companies have stated, in testimony and in oral argument, that should a preliminary injunction issue postponing their merger, their attempted merger will be abandoned. It is quite clear that mergers—like marriages—are not arranged in a vacuum, and that to postpone consummation for an extended time may erode the conditions which gave rise to their union in the first place. Despite this fact though, and without impugning the high professionalism and standing of counsel, the Court will not be intimidated or pressured by such suggestions regarding the gravity of the situation and the resultant impact this decision will have upon the future of this or other corporate mergers. It should be noted in this regard that the alternative would be to permit the two firms to join, under the illusion of a court order to maintain themselves "separate and apart" pending final adjudication. However, in that situation as well, the status quo could not be maintained over the several months or years involved. There is no way this or any court can hold the national economy static, no way it can prevent the economic necessity of the defendants to react to new conditions once their merger has been consummated. Already, personnel changes have been made and policy decisions implemented at White Motors whose impact cannot be doubted and whose effects cannot be reversed. (Affidavits of J. M. Fairbanks, J. J. O'Connor, and William L. Peterson, Transcript pp. 13–17 and 20–23). The defendants argue that under an appropriate "hold separate and apart" order, divestiture would be relatively simple should a permanent injunction issue after a full trial, and that to grant such an order would constitute sound policy. Quite to the contrary, however, it would only further bad policy and its implementation might present, ultimately, horrendous complexity. It would seem,

then, that in balancing possible harm to the defendants against probable antitrust violations, there is no question that national interests must take precedence.

The Government has raised, in addition to reciprocity and vertical antitrust violations, questions of possible horizontal effects from this merger in conjunction with the earlier acquisition by White Consolidated of Allis-Chalmers. In view of the foregoing discussion, however, and of the recent court-ordered divestiture of Allis-Chalmers, this issue now is moot and need not be dealt with further.

Similarly, to the Government's contention that the size and structure of these two firms may have anti-competitive effects transcending any single product market, the Court notes that there is no reason for it to enter so novel and uncharted a territory at this juncture. Rather, it is sufficient to note that in this case there are specific and identifiable lines of commerce, particularly sales of rolling-mill equipment, in which this merger would have the effect of lessening competition in the national market. The broader question of aggregate effects can best be raised in the context of a full trial.

It is the opinion of this Court that the Government has shown in pleadings, testimony, and oral argument both a probability of success at trial and the necessity that until that time the merger between the defendants be prevented; accordingly, a preliminary injunction is granted.

The defendants, White Motor Corporation and White Consolidated Industries, Inc., and their officers, directors, employees, agents, and all other persons acting in their behalf, shall not take any action in furtherance of or pursuant to the Agreement and Supplemental Agreement of Merger dated October 6, 1970, or any similar existing or future agreement, pending full discovery and final determination of the merits of the complaint of the Government.

It is so ordered.