**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**SIEMENS CORPORATION and G. D.
Searle & Co., Defendants-Appellees.**

**No. 1104, Docket 80–6055.**

United States Court of Appeals,
Second Circuit.

Argued April 1, 1980.

Decided April 16, 1980.

Bruce E. Fein, Dept. of Justice, Washington, D. C. (Sanford M. Litvack, Asst. Atty. Gen., Robert V. Allen, John J. Powers, III, Roger B. Andewelt, Kenneth M. Frankel, Nicholas W. Clark, Linda S. Chapman, Kent Brown, Attys., Dept. of Justice, Washington, D. C., of counsel), for plaintiff-appellant.

Guy Miller Struve, New York City (Davis, Polk & Wardwell, New York City, Sidley & Austin, Chicago, Ill., of counsel), for defendant-appellee G. D. Searle & Co.

Werner L. Polak, New York City (Shearman & Sterling, New York City, of counsel), for defendant-appellee Siemens Corporation.

Before LUMBARD, MANSFIELD and KEARSE, Circuit Judges.

MANSFIELD, Circuit Judge:

The United States of America appeals from an order of the District Court for the Southern District of New York, entered on March 20, 1980, by Judge Vincent L. Broderick, denying its motion for a preliminary injunction restraining Siemens Corporation (Siemens), a wholly owned subsidiary of Siemens A. G., a West German corporation, from acquiring certain assets of the Searle Diagnostics Division (SD) of defendant G. D. Searle & Co. (Searle), a Delaware corporation with its principal offices in Illinois. The complaint against Searle, which was filed by the government on March 12, 1980, pursuant to § 15 of the Clayton Act, 15 U.S.C. § 25,[1] claims that the acquisition would violate § 7 of the Clayton Act, 15 U.S.C. § 18,[2] in that it would tend substantially to lessen competition in the sale of nuclear medical diagnostic imaging equipment in the United States. Consummation of the proposed acquisition has been stayed pending this appeal. We affirm the denial of preliminary injunctive relief and vacate the stay.

Medical diagnostic imaging equipment is used, principally by hospitals, to provide images of internal body organs, tissues and structures for diagnostic purposes. There are four main types of such equipment: (1) ultrasound, which uses ultra-high sound waves (like Sonar) to form a cross-section of the patient's body, (2) X-ray, (3) computed tomography (CT) or computed axial tomography (CAT), which uses a computer to process X-rays diffracted from various directions through the patient's body to derive cross-sections of the body, and (4) nuclear, which consists of a gamma camera used to detect radiation emitted by radioactive isotopes introduced into the patient's body and a cathode ray with computer software to process and display the information conveyed by the radiation. Each of these four types of equipment is sufficiently differentiated to constitute a separate product market. In this case we are concerned with the nuclear medical equipment market. The United States is a separate geographic market for the sale of such equipment.

Nuclear medical equipment is highly sophisticated and quite expensive, often costing between $100,000 and $200,000, with hospitals the principal purchasers. Sales in the United States totalled approximately $100 million in 1979, or about 60% of the worldwide total. Production and sale of

---

1. Section 15 of the Clayton Act, 15 U.S.C. § 25, provides in pertinent part:

    "§ 25. *Restraining violations; procedure*
    "The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of this Act, and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations."

2. Section 7 of the Clayton Act, 15 U.S.C. § 18, provides in pertinent part:

    "§ 18. *Acquisition by one corporation of stock of another*
    "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock of other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

nuclear medical equipment in the United States is concentrated principally among four firms (Searle Diagnostics, Ohio Nuclear (now Technicare, Inc.), Picker Co. and General Electric Co.), with the distribution of total sales as follows:

| | 1975 | 1976 | 1977 | 1978 | 1979 |
|---|---|---|---|---|---|
| 1. General Electric .... | 3% | 7% | 8% | 15% | 17% |
| 2. Ohio Nuclear (now Technicare, Inc.) .. | 22% | 21% | 20% | 24% | 20% |
| 3. Picker ........... | 17% | 18% | 17% | 16% | 18% |
| 4. Searle Diagnostics .. | 50% | 43% | 42% | 30% | 22% |
| 5. All Others[3] ........ | 8% | 11% | 13% | 15% | 23% |

These figures, plus the testimony of witnesses, indicate that the nuclear medical equipment market, while concentrated, has been competitive, with General Electric increasing its share from 3% to 17% in five years. Although the market grew substantially since the 1960's, when nuclear equipment was in its infancy, growth in demand has slackened, due in part to increased governmental regulation of hospital costs, leaving a prognostication that sales of nuclear equipment in the years ahead will only gradually increase. With the levelling of market volume there has been increased price competition, with the result that Ohio Nuclear (now Technicare, Inc.) has earned only 5% to 10% on its investment since 1975 and Raytheon, one of the "Others," lost money from 1976 to 1978.

Another casualty has been SD, the pioneer firm in the market. Its market share has dropped dramatically over the last five years. It lost approximately $15 million dollars in 1978 and, after imposing various

economies, $2 million in 1979. According to testimony of senior Searle management officials, Searle determined in early 1979 that it could not justify investing the research and development funds required to keep SD technologically competitive, in light of the anticipated negative return on its investment in SD, and concluded that SD must be sold. After receiving inquiries from two other companies, Searle agreed to sell its SD business to Siemens on December 10, 1979.

Siemens manufactures and sells X-ray equipment and computer tomography equipment throughout the world, with its 1979 United States sales of these products totalling $87.2 million and $2.3 million, respectively. It makes and sells ultrasonic equipment outside of the United States, with 1979 sales of $26 million. Until June 1979 it also sold nuclear medical equipment outside the United States as a distributor for Ohio Nuclear Corp. (now Technicare, Inc.) and its sales of such equipment were $17.7 million. Siemens has on several occasions considered the possibility of entering the nuclear medical equipment market *de novo* or by a so-called "toe-hold" acquisition.[4] In 1969 it attempted to develop and sell its own gamma camera, but abandoned that effort because of technical difficulties and customer complaints. In 1972 it again considered entering the nuclear medical equipment field but, despite recommendations by some Siemens sales personnel in favor of such a move, it concluded that it

---

**3.** The "others" included such firms as ADAC, Raytheon and Toshiba. Not all of these firms sell a full line of nuclear medical equipment. Some manufacture and sell just gamma cameras while others, such as ADAC, sell just supporting computer software.

**4.** In terms of competitive effect, "toe-hold" entry is considered almost equivalent to *de novo* entry. As we pointed out in *BOC International v. FTC*, 557 F.2d 24, 26–27 n. 3 (2nd Cir.) a "toe-hold" acquisition has been variously defined as one of a "firm too small to compete by itself against the largest firms," *Kennecott Copper Corp. v. FTC*, 467 F.2d 67, 77–78 n. 8 (10th Cir. 1972), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974), one "sufficient to assist the potential entrant over the entry barriers . . . but not so large that

the entrant merely replaces the acquired company," *United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226, 1258 (C.D.Cal.), *affd. mem.*, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974), the acquisition "of a small market factor that presumably would increase the vigor of competition by strengthening the acquired firm," Robinson, Antitrust Developments: 1973, 74 Colum.L.Rev. 163, 182 n. 137 (1974), and the "acquisition of a small firm whose market share has remained the same . . . and that is demonstrably less efficient than its large competitors," Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1368 (1965). The acquisition of SD, still the largest firm in the market, is most certainly not a "toe-hold" purchase.

was too late to become a new entrant and that it would not be able to recover the investment required to make such an entry. In 1979 it briefly considered purchasing ADAC, a manufacturer of computers used in nuclear medical equipment, but that proved equally unsuccessful when ADAC declined a proposal that it develop a gamma camera.

On December 19 and 20, 1979, Searle and Siemens filed premerger notification reports pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a, thereby commencing the 30-day waiting period specified by 15 U.S.C. § 18a(b)(1). On January 30, 1980, the Antitrust Division of the Justice Department requested further information from Siemens and Searle pursuant to 15 U.S.C. § 18a(e)(2) and the requested information was furnished on February 20, 1980. The 20-day supplemental waiting period provided by 15 U.S.C. § 18a(e)(2) began to run on February 20, 1980. On the last day of the supplemental waiting period, March 11, 1980, the Antitrust Division notified counsel for Searle and Siemens that it intended to commence the present action and to seek a temporary restraining order and preliminary injunction the next day, on the ground the proposed merger eliminated a potential competitor, Siemens, from the nuclear medical equipment field.

On March 13 and 14 Judge Broderick held an evidentiary hearing at which the Government relied principally upon the testimony of three officers of manufacturers of nuclear medical equipment, two from Technicare, Inc., and one from Raytheon Corporation, plus various documents, including four memoranda by Siemens employees. The defendants, in turn, called the Senior Vice-President and Chief Financial Officer of Searle, as well as the Executive Vice-President of Siemens, who is also a member of its Board of Management and head of its Medical Group.

The evidence revealed that a manufacturer improves its chances to be competitive in the United States market for medical diagnostic imaging equipment if it can offer a full line of products, including nuclear equipment. Siemens has a strong technology base for manufacture of non-nuclear medical imaging equipment and an excellent reputation. In 1978 and 1979 some of its subordinate, non-managerial employees (e. g., Gerd Baer, John A. Diener, James J. Kelly) recommended expansion into the nuclear equipment, preferably by acquisition of Searle, ADAC, or some other suitable company. Dr. Frederick Kuhrt, Siemens' Executive Vice-President, testified that in view of Siemens' unsuccessful attempt to produce a gamma camera and its probable inability to recover its investment given the present market conditions of slow growth and uncertain profits, he and his decision-making colleagues, after reviewing the question several times, had decided against a *de novo* entry. Siemens was in his view "too late." To develop commercial nuclear sales via a new entry would in his opinion take "at least five years." On the other hand, he believed that by combining the technology and sales organizations of Siemens and SD, Siemens could turn a profit on the sale of nuclear medical equipment even though it planned to distribute the equipment through a separate sales and service organization rather than through its existing one.

One Government witness, Joseph B. Richey of Technicare, viewed Siemens as a potential entrant into the nuclear market and Herman Vahjen of Raytheon believed Siemens had the internal capability to create a nuclear product of its own. However, Vahjen conceded that his company had never been influenced in its competitive market decision-making by Siemens' potential entry and Richey stated that any seller of medical diagnostic imaging equipment, of which there were at least six, was a potential entrant.

On March 20, 1980, Judge Broderick filed a Memorandum Order to the effect that the evidence was inadequate to resolve even tentatively the issues and had left a series of unanswered questions which precluded him from determining whether the proposed acquisition might substantially lessen

competition within the meaning of § 7 of the Clayton Act, under either the "actual" or "perceived" potential entrant doctrine. The most he ventured was a finding that, although there was some evidence that Siemens was perceived by competitors to be a potential entrant, the perception had no pro-competitive influence on the market. There was no finding that entry *de novo* or by "toe-hold" acquisition by Siemens was possible, much less reasonably probable. Accordingly, preliminary injunctive relief was denied, from which denial the Government appeals.

## DISCUSSION

■ The Government claims that Siemens' proposed acquisition of SD would violate § 7 of the Clayton Act by eliminating potential competition by Siemens as a separate entrant into the nuclear medical equipment market or by eliminating its existing competitive influence as a firm presently perceived by competitors in the market to be a potential entrant. The "actual" potential competition doctrine would proscribe an acquisition of a large firm in an oligopolistic market if the acquiring firm would be expected to enter the market *de novo* or through a "toe-hold" acquisition of a firm lacking a significant share of the market. The theory of the doctrine is that competition in the market would be enhanced by the addition of the new competitor and therefore the elimination of such a potential competitor would substantially lessen competition within the meaning of § 7.

A good discussion of the doctrine, endorsing it, is found in Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1362–86. See *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 560, 93 S.Ct. 1096, 1114, 35 L.Ed.2d 475 (Marshall, J., concurring in result); *BOC International Ltd. v. FTC*, 557 F.2d 24 (2d Cir. 1977); *FTC v. Atlantic Richfield Co.*, 549 F.2d 289 (4th Cir. 1977). The doctrine, however, has not been sanctioned by the Supreme Court, which has expressly bypassed two opportunities to do so, *United States v. Marine Bancorporation Inc.*, 418

U.S. 602, 625–26 n. 28, 94 S.Ct. 2856, 2871–2872, 41 L.Ed.2d 978 (1974), quoting *Falstaff, supra*, 410 U.S. at 537, 93 S.Ct. at 1103. One possible reason for the Supreme Court's reluctance to embrace the doctrine is that it rests on speculation about the future conduct and competitive impact of a firm currently outside the market and perhaps intending to remain so. Even if the likelihood of a firm's entry is a probability, as distinguished from an "ephemeral possibility," see *Brown Shoe Co. v. United States*, 370 U.S. 294 at 323, 82 S.Ct. 1502, at 1522, 8 L.Ed.2d 510 (1962), its potential entry does not promote existing competition, since at most it may become a competitor *in futuro*. Moreover, entry by acquisition may have a pro-competitive effect on the market, such as where the outsider acquires a failing firm and thus strengthens the acquired firm's market position. *BOC International Ltd., supra*, 557 F.2d at 28.

The Supreme Court, in contrast, has expressly recognized that the acquisition of a large firm in an oligopolistic market by a "perceived" potential entrant may violate § 7. *Marine Bancorporation, supra*, 418 U.S. at 624–25, 94 S.Ct. at 2871–2872; *Falstaff, supra*, 410 U.S. at 531–37, 93 S.Ct. at 1100–1103. The "perceived" potential competition doctrine differs from the "actual" potential competition doctrine in that it is concerned with the *present* effect that a company not in the oligopolistic market is having on competitors within that market. If present competitors perceive an outsider as a potential entrant—one "waiting in the wings" or "on the fringe" of the market— they may keep prices and profit margins lower than if there were no threat of an outsider entering the market. When the outsider then acquires a large firm in the market, however, the disciplinary or tempering force of the outsider's presence "waiting in the wings" vanishes and competition is thereby lessened. *Marine Bancorporation, supra*, 418 U.S. at 639–40, 94 S.Ct. at 2878–2879; *Falstaff, supra*, 410 U.S. at 535 n. 13, 93 S.Ct. at 1103; *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 174, 84 S.Ct. 1710, 1718, 12 L.Ed.2d 775 (1964); *BOC International Ltd., supra*, 557 F.2d at 26.

Thus the elements which the Government must prove in order to make out an "actual" potential competition § 7 case include (1) an oligopolistic market, i. e., highly concentrated among a few large sellers, and (2) the proposed acquisition of one of these firms by a company which would, but for the acquisition, have entered the market as a competitor in the near future, either *de novo* or through a "toe-hold" acquisition.[5] In order to make out a "perceived" potential competition case the Government, in addition to showing a market highly concentrated among a few firms,[6] must prove that the acquiring company is (1) perceived by existing firms in the market as a potential independent entrant, and (2) has exercised a tempering impact on the competitive conduct of existing sellers.

The district court in substance found that the Government's evidence with respect to the foregoing essential elements of its case was insufficient to permit the court to make findings on the basic issues and accordingly denied relief on the ground that the Government had failed to sustain its burden. Because the Government contends that the district court held it to too stringent a standard in passing upon its motion for preliminary relief, it becomes necessary to discuss the proper standards for a preliminary injunction when the Government is the moving party.

In litigation among private parties, the party seeking preliminary relief must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2)

sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy Inc. v. H.P. Hood & Sons Inc.*, 596 F.2d 70, 72 (2d Cir. 1979); *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973). In the district court below the Government, relying on the first prong of the above test, contended that if it showed a reasonable probability of success on the merits, it was entitled to an injunction without making any showing of irreparable injury. On appeal, the Government relies upon the second prong, arguing that it need only raise sufficiently serious questions going to the merits to create a fair ground for litigation and show a balance of hardships tipping decidedly toward it.

We agree with the Government's position in the district court but not with its position here. The proper test for determining whether preliminary relief should be granted in a Government-initiated antitrust suit is whether the Government has shown a reasonable likelihood of success on the merits and whether the balance of equities tips in its favor. *United States v. Atlantic Richfield Co.*, 297 F.Supp. 1061, 1073–74, (S.D.N.Y.), *affd. sub nom. Bartlett v. United States*, 401 U.S. 986, 91 S.Ct. 1233, 28 L.Ed.2d 527 (1971); *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687, 693 (2d Cir. 1973) (dicta); *United States v. Culbro Corp.*, 436 F.Supp. 746, 749 (S.D.N.Y.1977); *United States v. Ingersoll-Rand Co.*, 218 F.Supp. 530, 545 (W.D.Pa.1963), *affd.*, 320 F.2d 509 (3d Cir.

---

**5.** In *Marine Bancorporation* the Supreme Court suggested that it was also necessary to show that *de novo* entry would have a procompetitive impact on the market. Although such an entry may have procompetitive effects, see *BOC International Ltd., supra,* 557 F.2d at 27 & n. 8, a study by the Federal Trade Commission indicates that entries by conglomerates through "toe-hold" acquisitions "have been unsuccessful, at least up to this point, in challenging entrenched leaders." FTC, *Conglomerate Merger Performance, An Empirical Analysis of Nine Corporations* at 127 (1972). The actual potential entrant doctrine may therefore have no applicability where the market is highly

competitive for the simple reason that *de novo* entry of an additional firm will not significantly enhance competition. Hence the requirement that the Government show that the market is oligopolistic.

**6.** As Professor Turner points out the perceived potential competition doctrine is only available to the Government if the market is oligopolistic. If the market is sufficiently competitive to enforce competitive behavior on existing sellers, their behavior will not be influenced by the threat of new entry, thus making the loss of a perceived potential entrant insignificant. 78 Harv.L.Rev. at 1363.

1963); *United States v. White Consolidated Industries, Inc.*, 323 F.Supp. 1397, 1399, 1400 (N.D.Ohio 1971); *United States v. Chrysler Corp.*, 232 F.Supp. 651, 659 (D.N.J. 1964); but cf. *United States v. Pennzoil Co.*, 252 F.Supp. 962, 986 (W.D.Pa.1965).

■ Because the Government in seeking to enjoin a merger under § 7 represents the public's interest in a competitive marketplace, the standards governing the granting of preliminary relief in private litigation are inappropriate. See *United States v. Ingersoll-Rand, supra*, 218 F.Supp. at 545; *United States v. Pennzoil, supra*, 252 F.Supp. at 986. Thus, once the Government demonstrates a reasonable probability that § 7 has been violated, irreparable harm to the public should be presumed. E. g., *United States v. Culbro Corp., supra*, 436 F.Supp. at 750 (citing cases). To warrant that presumption, however, the Government must do far more than merely raise sufficiently serious questions with respect to the merits to make them a fair ground for litigation. A preliminary injunction remains a drastic form of relief.

■ Nor does proof of likelihood of success on the merits relieve a court of equity of the duty to balance hardships, i. e., determine whether the harm to the defendants outweighs the likelihood that adequate relief will be available to the Government if the merger is consummated. E. g., *United States v. Culbro, supra*, 436 F.Supp. at 750; *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., supra*, 476 F.2d at 693. To be sure, once the Government has shown a reasonable likelihood of success on the merits, the equities will usually tip in its favor, since private interests must be subordinated to public ones, but surely where the harm to defendants is great and there is little likelihood that consummation of the merger would jeopardize ultimate relief, the court clearly may deny injunctive relief or fashion prophylactic measures to obviate the threat of harm. Thus, the district court must first determine the Government's likelihood of success on the merits and then, if necessary, balance the equities. The grant or denial of preliminary relief, of course, will only be reversed on a showing of an abuse of discretion.

Turning to the merits, the first issue is whether the nuclear medical equipment market is sufficiently oligopolistic for application of either prong of the potential competition doctrine. Although the Government, by introducing evidence of high barriers to entry and high concentration ratios, has clearly made out a prima facie case on these issues, *Marine Bancorporation, supra*, 418 U.S. at 631, 94 S.Ct. at 2874, the market nevertheless appears to be relatively new, volatile and competitive, as is evidenced by the successful entry of General Electric, which rose from 3% to 17% in five years, the rapid decline of SD, which slid from 50% to 22% during the same period, the inability of one major participant, Technicare, to earn more than 5% to 10% on its investment over a period of several years, the increase in the market share of "Others" from 8% to 23% in the years covered by the chart above, and admissions by Government witnesses that the market is increasingly competitive, particularly as to price. The bare market concentration ratios or percentages may not here " 'accurately depict the economic characteristics' of the market," *United States v. Black & Decker Mfg. Co.*, 430 F.Supp. 729, 748–55 (D.Md.1976). However, we need not decide whether this evidence of a competitive market is sufficient to rebut the Government's prima facie case, since the evidence fails to show the existence of other essential elements required to satisfy the doctrines of "actual" or "perceived" potential competition.

■ Assuming that the theory of elimination of actual potential competition may be the basis of preliminary injunctive relief, about which some respected authorities have voiced understandable doubt, see *FTC v. Atlantic Richfield, supra*, 549 F.2d at 293–94, there must, for purposes of determining whether such relief is appropriate, be at least a "reasonable probability" that the acquiring firm would enter the market, *BOC International Ltd., supra*, 557 F.2d at 28, and preferably clear proof that entry

would occur, see Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. at 1384, *FTC v. Atlantic Richfield, supra,* 549 F.2d at 294–95, since the loss threatened by the acquisition is not of existing, but only of potential, competition.[7]

Here the proof is inadequate to demonstrate the likelihood, much less the certainty, that Siemens would enter the market *de novo* but for the proposed acquisition. On the contrary, the evidence indicates that Siemens would not enter *de novo*. Unquestionably the objective evidence shows that it has the financial resources to enter and good reason to expand into the nuclear field. It currently manufactures and sells two of the four major types of medical imaging equipment and it distributes a third. Entry into manufacture and sale of nuclear equipment would enable it to offer a full line of products through established lines of distribution to its present trade. Thus there is both interest and incentive to enter, which is demonstrated by its brief attempt to develop and market a gamma camera in 1969–1972, and its efforts to purchase ADAC, a computer manufacturer, in 1979.

Against this evidence of incentive, interest and possible competence, however, there is persuasive proof that Siemens would not enter *de novo* but would do so only through acquisition. First of all there is no evidence of its technological competence to develop its own nuclear medical equipment or to transfer its acknowledged capability with respect to other types of equipment to nuclear medical equipment. Because we are not here confronted with the claim that Siemens may extend geographically its market for one of its existing products, as was the case in *Falstaff* and *Marine Bancorporation,* but rather with the claim that

it could develop an entirely new product, we must carefully scrutinize the technological feasibility of that expansion, particularly where, as here, the market is characterized by technological innovation. Siemens' failure to develop a technologically sound gamma camera in 1969–1972 indicates that it lacks the necessary technological expertise. Nor is there assurance of the ready availability of that expertise. Indeed, Government witnesses estimated that it would take at least 15 months to develop such a camera whereas Siemens' top management testified it would take five years. Such a long lead time is a powerful factor likely to inhibit new entry, see *United States v. Black & Decker Mfg. Co., supra,* 430 F.Supp. at 758–60.

■ Other factors strongly militating against the likelihood of *de novo* entry by Siemens are the state of the market and the limited profit prospects for a new manufacturer of nuclear medical equipment. The evidence indicates that the period of rapid market growth has passed or at least ebbed and that the future will be one of slow or gradual growth, held in check by governmental restrictions on new expensive medical equipment. Moreover, existing competitors in the market, including Raytheon, Technicare and SD, are either losing money or making an extremely modest profit, faced with keen price competition. As Professor Turner has stated:

"The presence or absence of an expanding market, and the rapidity with which the market is expanding, have a strong bearing on this. New entry by a number of firms becomes far less likely with a stable market or one expanding at a comparatively glacial pace. To be sure, even in those instances we are improving the odds by keeping all potential entrants from merging with existing producers.

---

**7.** Professor Turner contends that clear proof of likelihood of entry is required when "the *sole* alleged anticompetitive consequence of a merger is the loss of what would have been a new entrant." (Emphasis in original) 78 Harv.L. Rev. at 1386. Turner's test has apparently been adopted by the Fourth Circuit, *FTC v. Atlantic Richfield Co., supra,* 549 F.2d at 294–

95, which found peripheral support for the test in *Falstaff* and *Bancorporation*. In this case, the loss of an actual potential entrant is not the *sole* ground on which the Government challenges this proposed merger; it also claims that there is a loss of perceived potential competition.

But rational rules applying to mergers that involve the possible loss of a new entrant should take the trend of demand into account." 78 Harv.L.Rev. at 1385. Moreover, the Executive Vice-President of Siemens unequivocally testified that it had no intention of entering the United States nuclear medical equipment business *de novo*, explaining that Siemens had missed the market and that such entry would involve five years of losses for Siemens and an unacceptably low overall rate of return on investment. Although such self-serving testimony by officials of the acquiring firm regarding its intentions must be viewed with skepticism, see *Falstaff, supra*, 410 U.S. at 563–70, 93 S.Ct. at 1116–1119 (Marshall, J., concurring in result), it is entitled to some weight when, as here, it is confirmed by objective evidence suggesting that the market is unattractive to *de novo* entry. See *Falstaff, supra*, 410 U.S. at 534–536, 93 S.Ct. at 1101–1103; *FTC v. Atlantic Richfield, supra*, 549 F.2d at 298 & n. 11; *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 863–64 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974). Nor, as the Government contends, does the successful *de novo* entry of General Electric suggest that Siemens would be equally likely to succeed, since General Electric entered the market at a time of rapid expansion which no longer exists.

■ The Government's reliance upon a few memoranda of lower echelon Siemens' employees as indicative of an intent to enter the market *de novo* is misplaced. Aside from these employees' lack of management responsibility, they strongly urge the acquisition route, with only lip-service by one (Baer) to the possibility of "founding a new company." Moreover, their views do not appear to have been brought to the attention of the decision-making management. For instance, Dr. Kuhrt, Executive Vice-President of the company, had never seen the memoranda and was barely acquainted with Gerd Baer, the author of the document principally relied on by the Government, whom he had first met only the day before Kuhrt testified. The opinions of lower level employees without management responsibility, absent some indication that the senior management has seriously considered and endorsed those views, simply do not constitute evidence of a corporate intent or commitment to enter a business *de novo*. See, e. g., *FTC v. Atlantic Richfield, supra*, 549 F.2d at 296–97 & n. 9; *Stanley Works v. FTC*, 469 F.2d 498, 517–19 (2d Cir. 1972) (Mansfield, J., dissenting), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2750, 37 L.Ed.2d 155 (1972); *United States v. Crowell, Collier and MacMillan, Inc.*, 361 F.Supp. 983, 1005 (S.D.N.Y.1973).

Of the three employees of two companies already in the market (Technicare, Raytheon), who were called as witnesses by the Government only one, Richey of Technicare, testified that in his opinion Siemens would enter the nuclear medical equipment market, while Vahjen of Raytheon opined that it had the capability. If the self-serving testimony of Siemens' officials is to be viewed with skepticism, the same may be said of that of companies already entrenched in the market, who would hardly be expected to view with enthusiasm the infusion of competitive strength into the faltering SD.

The only issue remaining is whether Siemens was likely to enter the nuclear medical equipment market through a "toe-hold" acquisition. Since the Government offered no evidence of a toe-hold purchase that was available and attractive to Siemens, any such theory must be rejected for lack of proof. *Marine Bancorporation, supra*, 418 U.S. at 633, 94 S.Ct. at 2875; *Missouri Portland Cement Co. v. Cargill, supra*, 498 F.2d at 851; *United States v. Black & Decker Mfg. Co., supra*, 430 F.Supp. at 765–68; *FTC v. Atlantic Richfield, supra*, 549 F.2d at n. 10. Indeed the only reliable evidence in the record on the subject is that Siemens was unsuccessful in its attempt to acquire ADAC.

■ Turning to the Government's theory that Siemens was perceived by those in the nuclear medical equipment market as a potential competitor standing in the wings,

ready to enter if growth and profits prospects were attractive, and that it exercised a tempering influence on existing sellers of such equipment, the proof was likewise woefully deficient. A claim of "perceived" potential entry will not be upheld in the absence of evidence that present. competitors have altered or tempered their conduct as a result of the acquiring firm's presence. *United States v. Consolidated Foods Corp.*, 455 F.Supp. 108, 140 (E.D.Pa.1978); accord, e. g., *Marine Bancorporation, supra,* 418 U.S. at 640, 94 S.Ct. at 2879; *BOC International Ltd., supra,* 557 F.2d at 26; *Stanley Works v. FTC, supra,* 469 F.2d at 501 n. 8; *id.* at 519–20 & n. 11 (Mansfield, J., dissenting).

The Government, however, contends that it need not offer direct evidence of a present procompetitive influence in order to prevail, relying principally on footnote 13 of the plurality opinion in *Falstaff,* which states that the same objective evidence which would show that a firm is a likely entrant *de novo,* such as capability, interest and incentive, is also probative of the competitive impact of an "on the fringe" firm. Thus the Government reads footnote 13 as permitting a court to presume that a firm perceived as likely to enter a concentrated market has a present procompetitive influence on that market. Whatever the merits of that view might be if the proof demonstrates that the acquiring firm is likely to enter *de novo,* we must reject it here where the proof fails to show that Siemens is either a likely *de novo* entrant or is perceived by others as such. Although Joseph B. Richey of Technicare viewed Siemens as a likely entrant he offered no testimony that this had influenced or would influence the pricing or competitive conduct of his or any other company in the market. Herman Vahjen of Raytheon, on the other hand, testified that Siemens' possible entry never had any impact upon any pricing or marketing decision made by his company.

■ Thus the absence of any present procompetitive influence of Siemens' presence on the fringe is fatal to the Government's claim under the "perceived" potential competition doctrine. Our conclusion is further buttressed by evidence that the market is fairly competitive. While we did not decide, as noted above, whether that evidence was sufficient to render the potential competition doctrine inapplicable, given the high concentration ratio of the market, we do note that the more competitive the market, the less likely existing firms will be influenced by the threat of new entry. Accordingly, where, as here, there is evidence of other vigorous competition in the market, the Government must come forward with some evidence that Siemens exercises a present procompetitive influence. This it has failed to do.

Lastly, the Government failed to show that Siemens' potential competition was sufficiently significant to warrant an inference that its elimination would make any appreciable competitive difference. Usually this is proved by evidence that the actual or perceived potential entrant is one of but a few likely entrants. *FTC v. Procter & Gamble Co.,* 386 U.S. 568, 581, 87 S.Ct. 1224, 1231, 18 L.Ed.2d 303 (1967); *FTC v. Atlantic Richfield, supra,* 549 F.2d at 294 n. 8; *Missouri Portland Cement Co. v. Cargill, supra,* 498 F.2d at 865 n. 30; *United States v. Black & Decker Mfg. Co., supra,* 430 F.Supp. at 771; *United States v. Hughes Tool Co.,* 415 F.Supp. 637, 646 (C.D.Cal. 1976). Here, although the Government claims that there are only two other prospective entrants (North American Philips and CGR), one of its witnesses (Richey) conceded on cross-examination that there are at least six other companies which are "potential entrants into the market," and a total of 15 companies if all sellers of imaging devices, X-ray and ultrasound, are included. In view of the large number of potential entrants, the elimination of Siemens does not appear to pose a significant threat to competition. *See FTC v. Atlantic Richfield, supra,* 549 F.2d at 294 n. 8; *United States v. Black & Decker Mfg. Co., supra,* 430 F.Supp. at 771–73; *United States v. Hughes Tool Co., supra,* 415 F.Supp. at 646.

We recognize, as has been observed by a recent Assistant Attorney General in charge of the Antitrust Division that "problems of proof make potential competition cases difficult." [8] This case is no exception. With respect to the key issues there is simply a lack of sufficient evidence, as distinguished from speculation or suggested presumptions, to support preliminary relief.

It is hardly necessary, because of the Government's failure to adduce adequate evidence on the merits, to go into the subject of hardships. The record is clear that, as against sheer speculation regarding any anticompetitive effect the proposed acquisition would have upon existing or potential competition in the manufacture and sale of nuclear medical equipment, there is strong evidence that preliminary relief would cause immediate and irreparable injury to Searle and Siemens. Because of the uncertainty of SD's future after two years of substantial losses and the importance of continued future service, customers began to shy away from SD as a supplier and the morale of SD employees declined. This trend was temporarily reversed by the news that Siemens, a strong company with a good reputation, would acquire SD. The apprehension regarding SD's future, however, resumed when the Government commenced its suit and sought injunctive relief, with marketplace rumors to the effect that if the acquisition were not approved SD would go out of business. Thus, even if the Government's chances of success were doubtful instead of weak, the district court's denial of relief would not constitute an abuse of discretion.

The order of the district court is affirmed.

---

8. Statement of John H. Shenefield, *Hearings on S. 600 Before the Subcommittee on Antitrust, Monopoly and Business Rights of the Senate* *Committee on the Judiciary*, 96th Cong., 1st Sess. 66 (1979).